# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE NO.: | 2012AP336-CR |
| COMPLETE TITLE: | State of Wisconsin, |
| |        Plaintiff-Respondent, |
| |   v. |
| | Bobby L. Tate, |
| |        Defendant-Appellant-Petitioner. |

REVIEW OF A DECISION OF THE COURT OF APPEALS
Reported at 345 Wis. 2d 847, 826 N.W.2d 123
(Ct. App. 2012 – Unpublished)

| | |
|---|---|
| OPINION FILED: | July 24, 2014 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | October 3, 2013 |

| | |
|---|---|
| SOURCE OF APPEAL: | |
|   COURT: | Circuit |
|   COUNTY: | Milwaukee |
|   JUDGE: | Cimpl |

| | |
|---|---|
| JUSTICES: | |
|   CONCURRED: | |
|   DISSENTED: | ABRAHAMSON, C.J., BRADLEY, J., (joins Parts I-IV) dissent. (Opinion filed.) |
|   NOT PARTICIPATING: | |

ATTORNEYS:

For the defendant-appellant-petitioner, there were briefs by *Byron Lichstein*, law student *Michael J. King*, and *Frank J. Remington Center, University of Wisconsin Law School*, and oral argument by *Byron Lichstein*.

For the plaintiff-respondent, the cause was argued by *Jeffrey J. Kassel*, assistant attorney general, with whom on the brief was *J.B. Van Hollen*, attorney general.

NOTICE

**This opinion is subject to further editing and modification. The final version will appear in the bound volume of the official reports.**

No.   2012AP336-CR
(L.C. No.   2009CF2842)

STATE OF WISCONSIN          :          IN SUPREME COURT

State of Wisconsin,

    Plaintiff-Respondent,

  v.

Bobby L. Tate,

    Defendant-Appellant-Petitioner.

**FILED**

**JUL 24, 2014**

Diane M. Fremgen
Clerk of Supreme Court

---

REVIEW of a decision of the Court of Appeals.  *Affirmed.*

¶1   PATIENCE   DRAKE   ROGGENSACK,   J.   We   review   an unpublished decision of the court of appeals[1] affirming the decision of the Milwaukee County Circuit Court[2] denying defendant Bobby L. Tate's motion to suppress evidence that law enforcement obtained by tracking Tate's cell phone using cell site location information ("cell site information") and a stingray.  Before tracking Tate's cell phone, law enforcement obtained an order approving the use of a pen register/trap and trace device and

---

[1] State v. Tate, No. 2012AP336-CR, unpublished slip op. (Wis. Ct. App. Dec. 27, 2012).

[2] The Honorable Dennis R. Cimpl presided.

the release of certain subscriber information, such as cell tower activity and location information. Tate argues that law enforcement violated his right against unreasonable searches under both the Fourth Amendment of the United States Constitution and Article I, Section 11 of the Wisconsin Constitution and that the order authorizing the tracking of his cell phone required statutory authority, which it lacked.

¶2 In evaluating Tate's argument, we assume without deciding that: (1) law enforcement's activities constituted a search within the meaning of the Fourth Amendment and Article I, Section 11; and (2) because the tracking led law enforcement to discover Tate's location within his mother's home, a warrant was needed. We then conclude that the search was reasonable because it was executed pursuant to an order[3] that met the Fourth Amendment's and Article I, Section 11's requirements. See State v. Higginbotham, 162 Wis. 2d 978, 989, 471 N.W.2d 24 (1991). We also conclude that specific statutory authorization was not necessary for Milwaukee County Circuit Court Judge Jeffrey Wagner to issue the order that authorized the procedures used to track Tate's cell phone because the order was supported by probable cause. Nonetheless, the order did comply with the

---

[3] The document Milwaukee County Circuit Court Judge Jeffrey Wagner signed was captioned "Order." It is this document that functioned as a warrant for our constitutional considerations and as a criminal subpoena in regard to the information obtained from the cell service provider. State v. Sveum, 2010 WI 92, ¶¶20, 39, 328 Wis. 2d 369, 787 N.W.2d 317 (a document entitled "order" can constitute a warrant for Fourth Amendment purposes).

spirit of Wis. Stat. § 968.12 and Wis. Stat. § 968.135 (2009-10),[4] the search warrant and criminal subpoena statutes, which express legislative choices about procedures to employ for warrants and criminal subpoenas.[5] Accordingly, we affirm the decision of the court of appeals.

## I. BACKGROUND

¶3 On the evening of June 9, 2009, law enforcement responded to a homicide outside of Mother's Foods Market/Magic Cell Phones at 2879 N. 16th Street in Milwaukee. Upon arrival, officers found a victim lying between the curb and the sidewalk with a fatal gunshot wound to the head. A second victim was taken to the hospital to receive treatment for a gunshot wound to his left ankle.

¶4 Witnesses described the shooter as a black male wearing a striped polo shirt. Footage from Mother's Foods' surveillance camera showed a person matching the suspect's description purchase a prepaid cellular phone inside the store, leave the store and shoot the victim in the back of the head. The clerk who sold the phone to the suspect told police that the

---

[4] All subsequent references to the Wisconsin Statutes are to the 2009-10 version unless otherwise indicated.

[5] 2013 Wisconsin Act 375, enacted April 23, 2014, effective April 24, 2014, sets out the actions to be taken when an investigative or law enforcement officer seeks to obtain cell phone tracking information. See Wis. Stat. § 968.373 and Wis. Stat. § 968.375(4)(c) (2013-14). These statutes were not in effect when Tate's cell phone was tracked.

suspect identified himself to her as "Bobby" and said that he had just gotten out of prison that day.

¶5 Mother's Foods provided police with information about the phone the suspect purchased, including the telephone number assigned to the phone. Detective Patrick Pajot used two internet databases to confirm that US Cellular was the service provider for that phone.

¶6 Upon these facts, which Detective Pajot described in a sworn affidavit, Assistant District Attorney Grant Huebner applied for an order approving the following: (1) installation and use of a trap and trace device or process; (2) installation and use of a pen register device or process; and (3) the release of subscriber information, including cell tower activity and location and global positioning system (GPS) information that could identify the physical location of the target phone.[6]

---

[6] The order approved:

(1) . . . the installation and use of a trap and trace device or process[;]

(2) . . . the installation and use of a pen register device/process or Dialed Number Recorder (DNR) on a cellular telephone line, a designated Electronic Serial Number (ESN), an International Mobile Subscriber Identifier (IMSI), an International Mobile Equipment Identifier (IMEI), or other cellular lines of a particular subscriber[; and]

(3) . . . the release of subscriber information, incoming and outgoing call detail, cellular tower activity, cellular tower location, text header information, cellular toll information and cellular telephone global positioning system (GPS) location information, if available, and authorizing the

4

¶7 Officer Brian Brosseau of the Milwaukee County's Intelligence Fusion Division testified at the suppression hearing about the technology officers ultimately used to locate the suspect's phone, which included cell site information[7] and a stingray.[8] Cell site information allows law enforcement to locate a cell phone by triangulation. The Collection and Use of

---

identification of the physical location of a target cellular phone.

[7] With the older style analog cellular phones and digital mobile phones that are not GPS capable the cellular network provider can determine where the phone is to within a hundred feet or so using "triangulation" because at any one time, the phone is usually able to communicate with more than one of the aerial arrays provided by the phone network. The cell towers are typically 6 to 12 miles apart (less in cities) and a phone is usually within range of at least three of them. By comparing the signal strength and time lag for the phone's carrier signal to reach at each tower, the network provider can triangulate the phone's approximate position.

L. Scott Harrell, Locating Mobile Phones Through Pinging and Triangulation, Pursuit (July 1, 2008), http://pursuitmag.com/locating-mobile-phones-through-pinging-and-triangulation (last visited July 3, 2014).

[8] A stingray is an electronic device that mimics the signal from a cellphone tower, which causes the cell phone to send a responding signal. If the stingray is within the cell phone's signal range, the stingray measures signals from the phone, and based on the cell phone's signal strength, the stingray can provide an initial general location of the phone. By collecting the cell phone's signals from several locations, the stingray can develop the location of the phone quite precisely. Jennifer Valentino-DeVries, "Stingray" Phone Tracker Fuels Constitutional Clash, Wall Street Journal, Sept. 22, 2011, available at http://online.wsj.com/news/articles/SB10001424053111904194604576583112723197574 (last visited July 3, 2014).

Location Info. for Commercial Purposes: J. Hearing Before the Subcomm. on Commerce, Trade, and Consumer Prot. and Subcomm. on Commc'ns, Tech., and the Internet of the H. Comm. on Energy and Commerce, 111th Cong. 34, 36 (2010) (statement of Lorrie Faith Cranor, Assoc. Professor of Computer Science and of Engineering & Public Policy, Carnegie Mellon University). Any time a cell phone is turned on, it is searching for a signal and, in the process, identifying itself with the nearest cell tower every seven seconds. ECPA Reform and the Revolution in Location Based Tech. and Servs.: Hearing Before the Subcomm. on the Constitution, Civil Rights, and Civil Liberties of the H. Comm. on the Judiciary, 111th Cong. 17, 20-21 (2010) (statement of Matt Blaze, Associate Professor, University of Pennsylvania); In Re Application for Pen Register & Trap/Trace Device with Cell Cite Location Auth. 396 F. Supp. 2d 747, 750 (S.D. Tex. 2005). Cell service providers can "collect data from th[e]se contacts, which allows [them] to locate cell phones on a real-time basis and to reconstruct a phone's movement from recorded data." State v. Earls, 70 A.3d 630, 632 (N.J. 2013).

¶8 It is not clear from the record exactly how law enforcement used cell site information in the present case. We do not know whether US Cellular or law enforcement triangulated the signals from the target phone. We also do not know whether US Cellular regularly collects this information, or if it did so solely at law enforcement's request. Officer Brosseau explained only that, "[w]e were receiving information with the cell tower information, what that cell tower is currently on" and that, as

a general matter, "the cell phone provider . . . send[s] us data regarding a certain number . . . [pen] register[9] information on that particular phone number."  He stated that the phone signal "was bouncing between three different cell phone towers on three different sectors which if you were to map it out were to give you an angle or an area of probability of where you believe the suspect would be . . . at that time."

¶9   After law enforcement received cell site information from US Cellular, officers used a stingray to further narrow down the phone's location.  The stingray, a device that mimicked a cell tower, allowed officers to locate the phone based on signal strength.  See Jennifer Valentino-DeVries, "Stingray" Phone Tracker Fuels Constitutional Clash, Wall Street Journal, Sept. 22, 2011, available at http://online.wsj.com/news/articles/SB10001424053111904194604576 583112723197574 (last visited July 3, 2014).  Officer Brosseau explained that law enforcement's stingray is a "directional antenna mounted on our vehicle which will respond only to that electronic serial number of which we're looking for and it will

---

[9] Wisconsin Stat. § 968.27(13) defines a pen register as "a device that records or decodes electronic or other impulses that identify the numbers dialed or otherwise transmitted on the telephone line to which the device is attached."  Officer Brosseau explained that a pen register "records all of the towers and sectors" on which a cell phone is operating.  In other words, in order to provide cell site information to police, a cellular provider must have "its own pen register and send the results to law enforcement."  Steven B. Toeniskoetter, Preventing a Modern Panopticon:  Law Enforcement Acquisition of Real-Time Cellular Tracking Data, 13 Rich. J.L. & Tech. 16, ¶87 (2007).

give [us] an arrow, if you will, pointing to the direction and with the strength tell [us] how close [we] are to that particular electronic." Using the stingray, officers "could tell [the target phone] was on the . . . south and east side" of a particular apartment building on the 5700 block of West Hampton Avenue.

¶10 At that point, officers entered the apartment building and began knocking on the doors of individual apartments on the southeast side of the building. After searching the apartments of three or four residents and not locating what they were looking for, officers knocked on the door of the defendant's mother, Doris Cobb.

¶11 Officers entered[10] Cobb's apartment and asked her if Bobby was there. She told them he was, and pointed toward his bedroom. Officers found the defendant sleeping in the back bedroom, along with a striped polo shirt and a tennis shoe that appeared to have blood on it and the cell phone. They arrested Tate for first-degree intentional homicide.

---

[10] Witnesses gave conflicting testimony about whether Cobb granted law enforcement access to her apartment. Law enforcement officers said that she did, but Cobb testified that she did not, explaining that she "just opened the door, [and] they just came in" and that since "they were police, I thought they [were] supposed to come in." Transcript of Motion Hearing at 67, 70. Tate does not raise this issue, so we assume Cobb granted permission to enter her apartment. A.O. Smith Corp. v. Allstate Ins. Cos., 222 Wis. 2d 475, 492, 588 N.W.2d 285 (Ct. App. 1998) ("in order for a party to have an issue considered by this court, it must be raised and argued within its brief").

¶12 Tate moved to suppress the evidence seized pursuant to the order to track his cell phone, including the items seized from his mother's apartment, statements from people in the apartment building, and statements Tate made after his arrest. Tate argued that law enforcement needed a search warrant to track Tate's phone and that Judge Wagner's order was not the equivalent of a search warrant.

¶13 The circuit court denied the motion to suppress, concluding that Judge Wagner's order was sufficient to allow law enforcement to track Tate's phone to the apartment building and that Cobb consented to a search of the apartment. Tate pled no contest to first-degree reckless homicide, but appealed the suppression decision. The court of appeals affirmed the conviction, concluding that Judge Wagner had a "substantial basis for finding probable cause to issue the order to locate Tate's cell phone." We agree and now affirm the decision of the court of appeals.

## II. DISCUSSION

### A. Standard of Review

¶14 We independently review "whether police conduct violated the constitutional guarantee against unreasonable searches," which presents a question of constitutional fact. State v. Arias, 2008 WI 84, ¶11, 311 Wis. 2d 358, 752 N.W.2d 748 (quoting State v. Griffith, 2000 WI 72, ¶23, 236 Wis. 2d 48, 613 N.W.2d 72). However, we review a warrant-issuing magistrate's determination of whether the affidavit in support of the order was sufficient to show probable cause with "great deference."

Higginbotham, 162 Wis. 2d at 989. A warrant-issuing magistrate's determination of probable cause will be affirmed unless the facts asserted in support of the warrant are clearly insufficient to support probable cause. Id. We also independently determine whether "the language of a court order satisfies the requisite constitutional requirements of a warrant." State v. Sveum, 2010 WI 92, ¶17, 328 Wis. 2d 369, 787 N.W.2d 317.

¶15 And finally, in addressing Tate's argument that the circuit court lacked statutory authority to issue the order, we interpret and apply Wis. Stat. § 968.12 and Wis. Stat. § 968.135. Statutory interpretation and application present questions of law for our independent review. Richards v. Badger Mut. Ins. Co., 2008 WI 52, ¶14, 309 Wis. 2d 541, 749 N.W.2d 581. In so doing, we benefit from the discussions of both the court of appeals and the circuit court, just as we do with other questions of law. Marder v. Bd. of Regents of the Univ. of Wis. Sys., 2005 WI 159, ¶19, 286 Wis. 2d 252, 706 N.W.2d 110.

### B. Search

¶16 Tate compares cell phone tracking technology to the GPS tracking device that we examined in State v. Brereton, 2013 WI 17, ¶34, 345 Wis. 2d 563, 826 N.W.2d 369. He contends that tracking a cell phone through cell site information and a stingray involves a similar "usurpation of an individual's property" and therefore constitutes a search. Id.

¶17 In Brereton, we concluded that the law enforcement officers who placed a GPS device on a defendant's car and

10

monitored his movements in order to conduct surveillance "invad[ed] privacy interests long afforded, and undoubtedly entitled to, Fourth Amendment protection" when they used his property without his permission. Id. (quoting United States v. Jones, 132 S. Ct. 945, 954 (2012) (Sotomayor, J., concurring)).

¶18 When the United States Supreme Court analyzed a similar physical placement of a GPS device on a defendant's car, it did so in terms of trespass. Jones, 132 S. Ct. at 947. In Brereton, we noted that tracking through the use of a GPS device attached to a defendant's car may have constituted a search "even in the absence of a trespass." Brereton, 345 Wis. 2d 563, ¶34 (quoting Jones, 132 S. Ct. at 954-55 (Sotomayor, J., concurring)).

¶19 We reiterated that to determine whether a search occurs when law enforcement uses tracking technology to which a physical trespass on a defendant's property does not apply, we apply the test set forth in Katz v. United States, 389 U.S. 347 (1967), which asks whether "the government violates a subjective expectation of privacy that society recognizes as reasonable." Brereton, 345 Wis. 2d 563, ¶34 (quoting Jones, 132 S. Ct. at 954-55) (further citation omitted).

¶20 The issue of whether tracking through cell site information and a stingray "violates a subjective expectation of privacy that society recognizes as reasonable" is not before us because the State has conceded, and therefore has not briefed, whether such tracking is a search within the meaning of the

Fourth Amendment.[11]    Still, we briefly take stock of the doctrines that inform our search analysis and note several challenges in applying them to the technology at issue in this case.

¶21 First, analyzing whether surveillance using cell site information constitutes a search under <u>Katz</u> can become quite circular.  That is, "the same technological advances that have made possible nontrespassory surveillance techniques . . . also affect the <u>Katz</u> test by shaping the evolution of societal privacy expectations."  <u>Jones</u>, 132 S. Ct. at 955 (Sotomayor, J., concurring); <u>Jones</u>, 132 S. Ct. at 963 (Alito, J., concurring) ("phone-location-tracking services [that] are offered as 'social' tools . . . shape the average person's expectations about the privacy of his or her daily movements").

¶22 Second, it is unclear how the notion that a purchaser accepts goods as they come to him, including whether the goods

_____

[11] In <u>Riley v. California</u>, 573 U.S. __, 134 S. Ct. 2473 (2014), the United States Supreme Court held that an officer may not "search digital information on a cell phone seized from an individual who has been arrested" without prior judicial authorization.  <u>Id.</u> at 2480.  The Court explained that an individual retains a reasonable expectation of privacy in the contents of a cell phone because a search of that phone could reveal a panoply of personal information through which "[t]he sum of an individual's private life can be reconstructed."  <u>Id.</u> at 2489.  The Court discussed location information as one type, among many, of information a cell phone could contain.  It did not address, however, "the question whether the collection or inspection of aggregated digital information amounts to a search under other circumstances."  <u>Id.</u> at 2489 n.1.  Additionally, <u>Riley</u>'s applicability to the case before us is diminished because law enforcement obtained judicial authorization before tracking Tate's phone.

12

can be traced electronically in real time, should impact such an analysis. Jones, 132 S. Ct. at 952; see United States v. Karo, 468 U.S. 705, 712-13 (1984) (defendant was not entitled to object to law enforcement's tracking of a can of ether because the tracking device, a beeper, was placed in the can before it belonged to the defendant).

¶23 Further complicating the matter is the location of the cell phone. For example, when law enforcement contemplates tracking a cell phone, they may not know whether the phone is located in a private residence, which stands at the "very core" of the Fourth Amendment, or is traveling down a public highway, in which case a defendant may have no expectation of privacy in his movements. Kyllo v. United States, 533 U.S. 27, 31 (2001) (quoting Silverman v. United States, 365 U.S. 505, 511 (1961)); United States v. Knotts, 460 U.S. 276, 281 (1983) ("A person traveling in an automobile on public thoroughfares has no reasonable expectation of privacy in his movements from one place to another."); Sveum, 328 Wis. 2d 369, ¶79 (Ziegler, J., concurring) ("installing and monitoring a GPS tracking device on a vehicle in a public area does not constitute a search or seizure within the meaning of the Fourth Amendment").

¶24 Finally, even movements in public areas can reveal highly personal information such as "familial, political, professional, religious, and sexual associations," which if monitored too closely, may "chill[] associational and expressive freedoms." Jones, 132 S. Ct. 955-56 (Sotomayor, J., concurring.)

13

¶25 At a minimum, it seems that to successfully argue that one has a reasonable expectation of privacy in cell site information requires a reexamination of "the premise that an individual has no reasonable expectation of privacy in information voluntarily disclosed to third parties." Id. at 957 (Sotomayor, J., concurring).[12] Cases in which the United States Supreme Court asked not what information a hypothetical third person could obtain but rather, what a person generally expects from third parties show that third party doctrine, even in its current state, has permutations.[13]

---

[12] The United States Supreme Court developed the third party disclosure through a series of "false friend" cases that held that "one typically retains no federal constitutional reasonable expectation of privacy in information conveyed to a third party," but the "doctrine is not absolute." ABA Standards for Criminal Justice, Law Enforcement Access to Third Party Records at 6 & n.16, 7 (3d ed. 2013).

[13] See Florida v. Jardines, 133 S. Ct. 1409, 1416 (2013) ("introducing a trained police dog to explore the area around the home in hopes of discovering incriminating evidence" constitutes a search because it is not part of a "customary invitation" to attempt entry); City of Ontario, Cal. v. Quon, 560 U.S. 746, 760-65 (2010) (concluding that city's review of employee's text messages sent on a pager provided by the city was not unreasonable and therefore did not violate the Fourth Amendment); Kyllo v. United States, 533 U.S. 27, 34 (2001) (thermal imaging of a home constituted a search because the sense-enhancing technology was not "in general public use"); Bond v. United States, 529 U.S. 334, 335, 338-39 (2000) ("physical manipulation of a bus passenger's carry-on luggage" constituted a search because a passenger does not expect fellow bus passengers or bus employees to "feel the bag in an exploratory manner," even if he may expect them to move it, and therefore handle the bag).

¶26 We are mindful that courts should "proceed with care when considering the whole concept of privacy expectations in communications made on electronic equipment" and that "[t]he judiciary risks error by elaborating too fully on the Fourth Amendment implications of emerging technology before its role in society has become clear." City of Ontario, Cal. v. Quon, 560 U.S. 746, 759 (2010).  For that reason and because the parties do not dispute that a search occurred, we assume, without deciding, that tracking a cell phone using cell site information and a stingray constitutes a search that has constitutional implications.

### C.  Reasonableness of the Search

¶27 The Fourth Amendment of the United States Constitution[14] and Article I, Section 11 of the Wisconsin Constitution[15] protect persons from "unreasonable searches" and

---

[14] The Fourth Amendment of the United States Constitution provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

[15] Article I, Section 11 of the Wisconsin Constitution provides:

> The right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures shall not be violated; and no warrant shall issue but upon probable cause, supported by oath or affirmation, and

15

establish the manner in which warrants shall issue. State v. Henderson, 2001 WI 97, ¶17 & n.4, 245 Wis. 2d 345, 629 N.W.2d 613.[16] "Searches made without warrants issued pursuant to the requirements of the warrant clause are presumed to be unconstitutional." Id., ¶19.

¶28 As to searches made pursuant to a warrant, they pass constitutional muster if they comply with the three requirements of the Warrant Clause of the Fourth Amendment:

> (1) prior authorization by a neutral, detached magistrate; (2) a demonstration upon oath or affirmation that there is probable cause to believe that evidence sought will aid in a particular conviction for a particular offense; and (3) a particularized description of the place to be searched and items to be seized.

Sveum, 328 Wis. 2d 369, ¶20.

¶29 The first requirement "interposes[s] the impartial judgment of a [neutral] officer between the citizen and the police and also between the citizen and the prosecutor, so that an individual may be secure from an improper search." Id., ¶21 (quoting State ex rel. White v. Simpson, 28 Wis. 2d 590, 598, 137 N.W.2d 391 (1965)).

---

> particularly describing the place to be searched and the persons or things to be seized.

[16] We generally have interpreted the state constitution to provide "the same constitutional guarantees as the Supreme Court has accorded through its interpretation of the Fourth Amendment." State v. Kramer, 2009 WI 14, ¶18, 315 Wis. 2d 414, 759 N.W.2d 598; see also Sveum, 328 Wis. 2d 369, ¶18 n.7. We follow that tradition here.

¶30 The second requirement provides that the person seeking a warrant demonstrate upon oath or affirmation sufficient facts to support probable cause to believe that "the evidence sought will aid in a particular apprehension or conviction for a particular offense."  Henderson, 245 Wis. 2d 345, ¶19 (quoting Dalia v. United States, 441 U.S. 238, 255 (1979)) (internal quotation marks omitted).[17]  Finally, the third requirement focuses on the place to be searched and requires that it be identified with particularity, in addition to the items to be seized.  Id.  In the event that a search warrant does not comply with these requirements, we may invoke the exclusionary rule if no exception to the warrant requirements applies.  Sveum, 328 Wis. 2d 369, ¶31 & n.8.

## D.  Application

¶31  Tate argues that law enforcement officers performed an illegal search when they tracked his cell phone using cell site information and a stingray because the tracking constituted a search that violated the Fourth Amendment of the United States Constitution and Article I, Section 1 of the Wisconsin Constitution and because Judge Wagner "lacked statutory authority to issue an order authorizing police to track Tate's phone in real time."  This latter contention implies that

---

[17] Tate urges us to disregard the "apprehension" portion of this formulation, arguing that Warden v. Hayden, 387 U.S. 294, 307 (1967), the original source of this language, is properly regarded as dicta.  Because we conclude that the phone had evidentiary value, we do not reach this argument.

17

statutory authority is necessary to the lawful issuance of a warrant.

¶32  In regard to the latter contention, Tate also asserts that the statutes Judge Wagner cited, Wis. Stat. § 968.35, Wis. Stat. § 968.36, 18 U.S.C. §§ 2703, 2711, 3117, 3125, and 3127, did not grant the court the power to authorize law enforcement

to obtain location data through cell site information or a stingray, either individually or collectively.[18]

### 1. Constitutional sufficiency

¶33  To be constitutionally sufficient, a warrant must be based on probable cause and be reasonable both in its issuance and in its execution.  Henderson, 245 Wis. 2d 345, ¶¶18-20.  The warrant we review was based on the affidavit of Detective Pajot,

---

[18] Tate cites federal cases holding that this mosaic of authority is insufficient to allow law enforcement to track a cell phone using cell site information.  But, the State points out, in those cases the government sought to obtain cell site information not upon a showing of probable cause, but upon a lower statutory showing.  See In re Application of the United States for an Order Authorizing the Disclosure of Prospective Cell Site Info., 412 F. Supp. 2d 947, 949 n.1 (E.D. Wis. 2006) (the issue "of whether a search warrant issued in accordance with the provisions of Rule 41 would support issuance of the requested order (if the appropriate showing were made) is not before" the court); In re Application for Pen Register & Trap/Trace Device with Cell Site Location Auth., 396 F. Supp. 2d 747, 765 (S.D. Tex. 2005) ("Denial of the government's request for prospective cell site data in this instance should have no dire consequences for law enforcement. This type of surveillance is unquestionably available upon a traditional probable cause showing under Rule 41."); In re Application of the United States for an Order (1) Authorizing the Use of a Pen Register & a Trap & Trace Device and (2) Authorizing Release of Subscriber Info. and/or Cell Site Info., 396 F. Supp. 2d 294, 300 (E.D.N.Y. 2005) ("disclosure of cell site information turns a mobile telephone into a 'tracking device' and therefore such disclosure may not be authorized without a showing of probable cause"); In re Application of the United States for an Order Authorizing the Installation & Use of a Pen Register & a Caller Identification Sys. on Tele. Nos. [] & [] and the Prod. of Real Time Cell Cite Info., 402 F. Supp. 2d 597, 605 (D. Md. 2005) ("When the government seeks to acquire and use real time cell site information to identify the location and movement of a phone and its possessor in real time, the court will issue a warrant upon a sworn affidavit demonstrating probable cause to believe the information will yield evidence of a crime.").

who described sufficient facts to support probable cause to believe that the cell phone site information law enforcement sought would aid in "a particular apprehension or conviction for a particular offense." Id., ¶19 (quoting Warden v. Hayden, 387 U.S. 294, 307 (1967)) (internal quotation marks omitted).

¶34 Judge Wagner was told that a surveillance video made at the time of a homicide captured a person wearing a distinctive shirt, who identified himself to a store clerk as "Bobby" when he purchased a cell phone. He also was told that, moments later, surveillance video captured a person matching that physical description shooting two people outside the store. Finding the cell phone the suspect purchased could be probative that the person in possession of the phone was the shooter. Tate has not established that the facts before the circuit court were clearly insufficient to support a determination of probable cause. See id.; Higginbotham, 162 Wis. 2d at 989.

¶35 In regard to Tate's complaint that Detective Pajot, Assistant District Attorney Huebner and Judge Wagner did not address why the cell phone constituted evidence of a crime, neither the Fourth Amendment nor our decisions require the person seeking a warrant to explain why a particular object or information constitutes evidence. Higginbotham, 162 Wis. 2d at 989.

¶36 Starting with Assistant District Attorney Huebner's application for the order and the order itself, the standard is whether the warrant-issuing magistrate is "apprised of sufficient facts to excite an honest belief in a reasonable mind

20

that the objects sought are linked with the commission of a crime, and that the objects sought will be found in the place to be searched." State v. Starke, 81 Wis. 2d 399, 408, 260 N.W.2d 739 (1978). In keeping with this standard, our decisions have focused on the sufficiency of the evidence, not the legal arguments of the applicant or the reasoning of the magistrate. E.g., State v. Kerr, 181 Wis. 2d 372, 380-81, 511 N.W.2d 586 (1994) (although the supporting affidavit contained "minimal factual basis to support probable cause," we upheld a determination of probable cause based on the "veracity and basis of knowledge of persons supplying . . . information").

¶37 As to Detective Pajot's affidavit, we have described the responsibilities of an affiant seeking a warrant as follows:

> [A]ffidavits for search warrants[] . . . must be tested and interpreted by magistrates and courts in a commonsense and realistic fashion. They are normally drafted by nonlawyers in the midst and haste of a criminal investigation. Technical requirements of elaborate specificity once exacted under common law pleadings have no proper place in this area. A grudging or negative attitude by reviewing courts toward warrants will tend to discourage police officers from submitting their evidence to a judicial officer before acting. . . . Recital of some of the underlying circumstances in the affidavit is essential if the magistrate is to perform his detached function and not serve merely as a rubber stamp for the police. However, where these circumstances are detailed, where reason for crediting the source of the information is given, and when a magistrate has found probable cause, the courts should not invalidate the warrant by interpreting the affidavit in a hypertechnical, rather than a commonsense, manner.

Higginbotham, 162 Wis. 2d at 991-92 (quoting Starke, 81 Wis. 2d at 410) (further citation omitted).

21

¶38 Although we do not require an affiant to provide legal theories, we do require a narration of sufficient facts and a statement upon what basis such a narration is made. However, if an affiant seeks a warrant based solely on his or her own legal conclusions, the magistrate cannot find probable cause. Id. at 992. Having concluded that Judge Wagner had a sufficient factual basis for finding probable cause, we turn to Tate's particularity argument.[19]

¶39 Tate argues that the order fails the Fourth Amendment's particularity requirement because it does not specify a particular location where evidence will be found. When it had failed to timely obtain a warrant for the monitoring of a beeper in a home, the government made a similar argument in Karo: "it would be impossible to describe the 'place' to be searched, because the location of the place is precisely what is sought to be discovered." Karo, 468 U.S. at 718. The Supreme Court was not impressed with that logic and concluded that the government could describe the object into which the beeper would be placed and the circumstances that led the government to want to install the beeper. Id.

¶40 Tate's similar argument that the particularity requirement of the Fourth Amendment's warrant clause was not met fails for two reasons. First, both the United States Supreme Court and this court have upheld searches involving tracking

---

[19] Tate does not dispute that Judge Wagner was a neutral magistrate, so we do not address that warrant requirement.

22

devices despite the impossibility of describing the exact place to be searched by a traditional description, such as a street address. Id.; Brereton, 345 Wis. 2d 563, ¶¶52-54; Sveum, 328 Wis. 2d 369, ¶52. Second, we disagree with Tate's argument that since there was no physical installation of the tracking device on Tate's property in this case, as there was in Karo, Brereton, and Sveum, the order does not satisfy the particularity requirement.

¶41 In Sveum, we explained that "[i]n order to satisfy the particularity requirement, the warrant must enable the searcher to reasonably ascertain and identify the things which are authorized to be seized." Sveum, 328 Wis. 2d 369, ¶27 (quoting State v. Noll, 116 Wis. 2d 443, 450-51, 343 N.W.2d 391 (1984)). While a description of the object into which the tracking device was to be placed was a factor in satisfying the particularity requirement in Sveum, there is no reason why another way of identifying a cell phone, such as by its electronic serial number, cannot serve the same function as physically placing the tracking device on Tate's property. Accordingly, we conclude that the employment of the electronic serial number for Tate's phone satisfies the particularity requirement because that number permits a particularized collection of cell site information for only one cell phone. Therefore, applying great deference to Judge Wagner's probable cause determination, we conclude that the warrant passes constitutional muster.

2. Statutory sufficiency

23

¶42 No specific statutory authority is necessary to the issuance of a valid warrant for cell site information. See id., ¶¶69-72 (explaining that the failure to comply with all of the statutory provisions relating to warrants did not affect the validity of the warrant). However, even though statutory authorization was not necessary in order to issue the warrant, because the legislature has enacted general criteria about the procedures to employ with regard to issuing warrants, we examine relevant statutes.

¶43 Wisconsin Stat. § 968.10(3) authorizes searches pursuant to a valid warrant, and Wis. Stat. § 968.12(1) provides:

> A search warrant is an order signed by a judge directing a law enforcement officer to conduct a search of a designated person, a designated object or a designated place for the purpose of seizing designated property or kinds of property. A judge shall issue a search warrant if probable cause is shown.

The probable cause that § 968.12(1) speaks to is comparable to probable cause under the Fourth Amendment. See id., ¶44; see also Bergman v. State, 189 Wis. 615, 617-18, 208 N.W. 470 (1926) (quoting State v. Blumenstein, 186 Wis. 428, 430, 202 N.W. 684 (1925) (overruled on other grounds)) (§ 968.12's predecessor, Wis. Stat. § 4839, "must be construed in accordance with the constitutional requirements upon the subject of searches and seizures").

¶44 Wisconsin Stat. § 968.12(1) requires a judge to issue a warrant upon a showing of probable cause, and we conclude that

24

Judge Wagner's order was supported by probable cause. We also conclude that law enforcement's use of a stingray to locate Tate's cell phone was reasonable. Law enforcement's use of cell site information requires additional discussion because § 968.12(1) must be read in concert with Wis. Stat. § 968.13(2) and Wis. Stat. § 968.135 in order to have a more complete statutory picture when law enforcement seeks a warrant to obtain cell site information.

¶45 Tate explained in his brief that "[w]hen a cell phone identifies itself to a cell site, a log of location information is created and stored in a carrier's database."[20] While the record in this case does not show exactly what form this log of location information takes, we think it is safe to assume that it would come within Wis. Stat. § 968.13(2)'s broad definition of documents, which "includes, but is not limited to, books, papers, records, recordings, tapes, photographs, films or computer or electronic data."[21]

---

[20] We do not know whether US Cellular maintained this log as a matter of routine or whether it installed a pen register at law enforcement's request in order to collect cell site information for law enforcement. See Toeniskoetter, supra note 9 (cellular service providers obtain cell site information by installing their own pen register). This distinction could matter if law enforcement had not obtained prior judicial authorization for the tracking. See Wis. Stat. § 968.34(2)(a) (prohibiting the use of a pen register without prior judicial authorization, subject to certain exceptions, one of which relates to a cellular service provider's "operation, maintenance and testing of a wire or electronic communication service").

[21] See also In re Application of the United States for Historical Cell Site Data, 724 F.3d 600, 615 (5th Cir. 2013) ("[c]ell site data are business records").

¶46 Search warrants issued under Wis. Stat. § 968.12(1) may not authorize the seizure of documents, Wis. Stat. § 968.13(1)(c), unless they are "under the control of a person who is reasonably suspected to be concerned in the commission of that crime," § 968.13(1)(d). According to Officer Brosseau's testimony, law enforcement officers tracked Tate's cell phone using cell site information obtained from a cellular service provider. Therefore, the documents sought were in the hands of a third party; they were not "under the control of a person who is reasonably suspected to be concerned in the commission of that crime."

¶47 When law enforcement wants to compel a third party to turn over documents, it can proceed to obtain an order to that effect, pursuant to Wis. Stat. § 968.135. Section 968.135 provides that "a court shall issue a subpoena requiring the production of documents, as specified in s. 968.13(2)." This is done "[u]pon the request of the attorney general or a district attorney and upon a showing of probable cause."[22] Id.

---

[22] Because Wis. Stat. § 968.135 "does not limit or affect any other subpoena authority provided by law," we note that § 968.135 does not restrict the authority to issue a subpoena under Wis. Stat. § 968.375. Section 968.375 describes situations in which a judge may issue a subpoena or warrant to obtain records or information from an "electronic communication service or remote computing service provider." It does not limit a judge's powers under the more general subpoena statute, § 968.135. We do not decide whether § 968.375 provides an additional source of authority for Judge Wagner's order because no party has addressed § 968.375.

¶48 We have held that failure to make a probable cause determination, when one is required in order to obtain particular documents, may deprive a defendant of the safeguards to which he is entitled. State v. Popenhagen, 2008 WI 55, ¶4, 309 Wis. 2d 601, 749 N.W.2d 611. However, Popenhagen has no application here.

¶49 In Popenhagen, law enforcement officers and the district attorney obtained a criminal defendant's bank records pursuant to a subpoena issued under Wis. Stat. § 805.07, the civil subpoena statute. Because they sought to obtain the record as part of a criminal investigation, they should have proceeded under the criminal subpoena statute, Wis. Stat. § 968.135, which

> strictly limits a court's issuance of a subpoena for the production of documents. Only the attorney general or a district attorney may request a subpoena for the production of documents. The request must be ruled upon by the circuit court before the subpoena is issued. The circuit court may issue a subpoena for documents only upon a showing of probable cause.[23]

---

[23] The legislature chose to require probable cause for a subpoena issued under Wis. Stat. § 968.135. We note, however, that we do not decide whether the Fourth Amendment comes into play when obtaining cell site information in part because any electronic documents have necessarily been shared with a third party. See In re Application of the United States for Historical Cell Site Data, 724 F.3d at 614-15 (rejecting a constitutional challenge to the Stored Communication Act's "specific and articulable facts" standard for disclosure of historical cell site information because a cell phone user "voluntarily conveys . . . cell site data" to the phone company "each time he makes a call").

Id., ¶53. The officers in Popenhagen did not present an affidavit showing probable cause to the subpoena-issuing judges and those judges did not make the determination of probable cause that § 968.135 requires. Id., ¶7.

¶50 Unlike the defendant in Popenhagen, Tate was not deprived of Wis. Stat. § 968.135's safeguards. Judge Wagner issued the order upon the request of a district attorney. He determined that the probable cause standard had been met based on Detective Pajot's sworn affidavit. We reject the argument that the court's citation to statutes that may not have been the best choices is reversible error because Judge Wagner's analysis was consistent with the legal standard Wis. Stat. § 968.12 and Wis. Stat. § 968.135 required. Accordingly, we conclude that Tate's substantial rights were not prejudiced.

### III. CONCLUSION

¶51 In evaluating Tate's argument, we assume without deciding that: (1) law enforcement's activities constituted a search within the meaning of the Fourth Amendment and Article I, Section 11; and (2) because the tracking led law enforcement to discover Tate's location within his mother's home, a warrant was needed. We then conclude that the search was reasonable because it was executed pursuant to a warrant that met the Fourth Amendment's and Article I, Section 11's requirements. See Higginbotham, 162 Wis. 2d at 989. We also conclude that specific statutory authorization was not necessary for Judge Wagner to issue the order that authorized the procedures used to track Tate's cell phone because the order was supported by

28

probable cause. Nonetheless, the order did comply with the spirit of Wis. Stat. § 968.12 and Wis. Stat. § 968.135, which express legislative choices about procedures to employ for warrants and criminal subpoenas. Accordingly, we affirm the decision of the court of appeals.

*By the Court.*—The decision of the court of appeals is affirmed.

¶52 SHIRLEY S. ABRAHAMSON, C.J. *(dissenting).* "Advances in technology offer great benefits to society in many areas. At the same time, they can pose significant risks to individual privacy rights."[1] The proliferation of cell phones and their location tracking capabilities exemplify the risks to privacy rights posed by technological advancement.

¶53 The criminal cases State v. Tate[2] and State v. Subdiaz-Osorio[3] raise the question whether individuals have a constitutional right of privacy in their cell phone location data. In other words, do the United States[4] and Wisconsin Constitutions[5] permit law enforcement to access a person's cell phone location data without a warrant?

---

[1] State v. Earls, 70 A.3d 630, 631-32 (N.J. 2013).

[2] State v. Tate, 2014 WI 89, ___ Wis. 2d ___, ___ N.W.2d ___.

[3] State v. Subdiaz-Osorio, 2014 WI 87, ___ Wis. 2d ___, ___ N.W.2d ___.

[4] The Fourth Amendment to the United States Constitution provides:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

[5] Article 1, Section 11 of the Wisconsin Constitution provides:

The right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures shall not be violated; and no warrant shall issue but upon probable cause, supported by oath or affirmation, and particularly describing

¶54 Cell phones are a "pervasive and insistent part of daily life . . . ."[6] The vast majority of Americans own cell phones; the Pew Research Center has reported that, as of May 2013, 91% of American adults have a cell phone and 56% have a smartphone.[7] Cell phones are literally and figuratively attached to their users' persons, such that "the proverbial visitor from Mars might conclude they were an important feature of human anatomy."[8] Unlike land-line phones, people generally carry cell phones with them at all times——at home, in the car, at work, and at play.

¶55 Cell phones can thus serve as powerful tracking devices that can pinpoint our movements with remarkable accuracy. They can isolate in time and place our presence at shops, doctors' offices, religious services, Alcoholics Anonymous meetings, AIDS treatment centers, abortion clinics, political events, theaters, bookstores, and restaurants, and

---

the place to be searched and the persons or things to be seized.

[6] Riley v. California, 134 S. Ct. 2473, 2484 (2014).

[7] Earls, 70 A.3d at 638.

[8] Riley, 134 S. Ct. at 2484. The Riley Court additionally noted that "nearly three-quarters of smart phone users report being within five feet of their phones most of the time, with 12% admitting that they even use their phones in the shower." Id. at 2490.

2

identify with whom the user of the cell phone associates.[9] Cellular service providers have records of the geographic location of almost every American at almost every moment of the day and night.[10] Accessing this information reveals intimate details about a person and intrudes on the constitutional right of association. The United States Supreme Court characterizes location data as "qualitatively different" from physical records, noting that location data can "reconstruct someone's specific movements down to the minute, not only around town but also within a particular building."[11] The more precise the tracking, the greater the privacy concerns.

¶56 Cell phone location data can also be a formidable instrument in fighting crime. In both Tate and Subdiaz-Osorio, the law enforcement officers were performing their important public safety duties by investigating violent crimes. Both criminal suspects were apprehended in relatively short order through law enforcement use of cell phone location data.

¶57 The officers in Tate and Subdiaz-Osorio had to deal with the thorny issues raised by seeking access to individuals'

---

[9] See Earls, 70 A.3d at 632. See also Riley, 134 S. Ct. at 2489 ("Cell phones differ in both a quantitative and a qualitative sense from other objects that might be kept on an arrestee's person. . . . [Cell phones] could just as easily be called cameras, video players, rolodexes, calendars, tape recorders, libraries, diaries, albums, televisions, maps, or newspapers.").

[10] See Noam Cohen, It's Tracking Your Every Move and You May Not Even Know, N.Y. Times, Mar. 26, 2011, at A1.

[11] Riley, 134 S. Ct. at 2490 (citing United States v. Jones, 132 S. Ct. 945 (2012) (Sotomayor, J., concurring)).

cell phone location data. Law enforcement is the first word in interpreting constitutional requirements; the courts are the last.

¶58 It is this court's responsibility to evaluate a potential search "by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests." Wyoming v. Houghton, 526 U.S. 295, 300 (1999).

¶59 This court owes it to law enforcement, lawyers, litigants, circuit courts, the court of appeals, and the public at large to provide clarity about when a search has occurred regarding cell phone location data and what procedures must be undertaken by the government to render such searches constitutional.[12] A clear set of rules will protect privacy interests and also give guidance to individuals evaluating these interests.

¶60 Rather than dance around the issue of whether government access to cell phone location data in the instant cases is a search within the meaning of the Constitutions, I propose that the court address it head-on. Government access to cell phone location data raises novel legal questions of great importance for the privacy rights of the public in an emerging

---

[12] "[W]e promote clarity in the law of search and seizure and provide straightforward guidelines to governmental officers who must apply our holdings." State v. Williams, 2012 WI 59, ¶25, 341 Wis. 2d 191, 814 N.W.2d 460.

4

area of technology——exactly the type of questions appropriate for resolution pursuant to this court's law-developing function.

¶61 I conclude that government access to cell phone location data in the instant cases, which involves invasive surveillance of an individual's movements, is a search within the meaning of the Constitutions.[13] To read the Constitutions more narrowly is to ignore the vital role that the cell phone has come to play in private communications, to paraphrase the United States Supreme Court in Katz v. United States, 389 U.S. 347, 352 (1967).[14]

¶62 People do not buy cell phones to have them serve as government tracking devices. They do not expect the government to track them by using location information the government gets from cell phones.[15] People have a subjective expectation of privacy in cell phone location data that society is prepared to

---

[13] Justices Ann Walsh Bradley and N. Patrick Crooks agree with this conclusion.

[14] "To read the Constitution more narrowly is to ignore the vital role that the public telephone has come to play in private communication." Katz v. United States, 389 U.S. 347, 352 (1967).

[15] See, e.g., United States v. Davis, ___ F.3d ___, 2014 WL 2599917, at *9 (11th Cir. 2014) ("[I]t is unlikely that cell phone customers are aware that their cell phone providers collect and store historical location information.") (quoting In re Application of U.S. for an Order Directing a Provider of Elec. Commc'n Serv. To Disclose Records to Gov't, 620 F.3d 304, 317 (3d Cir. 2010)); Earls, 70 A. 3d at 632.

recognize as reasonable. Thus, absent a warrant, such a search is per se unreasonable.[16]

¶63 If the State does not have a warrant, the State can access cell phone location data only if the State can demonstrate one of the narrowly drawn exceptions to the warrant requirement. In both Tate and Subdiaz-Osorio, law enforcement officers could have accessed cell phone location data with a properly authorized warrant that complied with existing relevant statutes.[17] They did not.

¶64 I address the balance between privacy interests and law enforcement interests as presented by Tate and Subdiaz-Osorio.[18] These two cases address substantially similar issues regarding government access to cell phone location data but pose distinct fact patterns.

¶65 Neither the Tate majority opinion nor Justice Prosser's lead opinion in Subdiaz-Osorio decides whether the government access in question constituted a search within the meaning of the United States and Wisconsin Constitutions. Both opinions assume that a search occurred.

¶66 Despite the insistence of the Tate majority opinion and Justice Prosser's lead opinion in Subdiaz-Osorio that they

---

[16] State v. Sanders, 2008 WI 85, ¶27, 311 Wis. 2d 257, 752 N.W.2d 713; State v. Payano-Roman, 2006 WI 47, ¶30, 290 Wis. 2d 380, 714 N.W.2d 548.

[17] I refer to the court order issued in Tate as a "warrant," as does the Tate majority opinion. The applicable statute refers to a court issuing a "subpoena" requiring the production of documents. Wis. Stat. § 968.135.

[18] "Privacy comes at a cost." Riley, 134 S. Ct. at 2493.

6

merely assume, without deciding, that the government access was a search in each case,[19] both opinions address the search issue as they elaborate on cases and principles underlying their assumption that a search occurred.

¶67 The Tate majority opinion and Justice Prosser's lead opinion in Subdiaz-Osorio refer to and draw guidance from the same Wisconsin and United States Supreme Court cases, including the recently mandated Riley v. California, 573 U.S. ___, 134 S. Ct. 2473 (2014).[20]

¶68 The Tate majority opinion and Justice Prosser's lead opinion announce principles of law that overlap and to an extent

---

[19] Tate, majority op., ¶¶2, 26; Subdiaz-Osorio, 2014 WI 87, ¶¶9, 70 (Prosser, J., lead op.). But see Subdiaz-Osorio, 2014 WI 87, ¶132 (Roggensack, J., concurring) (accusing Justice Prosser's lead opinion in Subdiaz-Osorio of not merely assuming the issue of the reasonable expectation of privacy but in effect deciding the issue).

[20] See Riley, 134 S. Ct. 2473 (cited in Tate, majority op., ¶20 n.11; in Subdiaz-Osorio, 2014 WI 87, ¶47 n.23 (Prosser, J., lead op.)); Katz, 389 U.S. at 353 (cited in Tate, majority op., ¶¶19-21; in Subdiaz-Osorio, 2014 WI 87, ¶¶51-52, 65-66 (Prosser, J., lead op.); in Subdiaz-Osorio, 2014 WI 87, ¶3 (Roggensack, J., concurring)); Jones, 132 S. Ct. 945 (2012) (cited in Tate, majority op., ¶¶17-25; in Subdiaz-Osorio, 2014 WI 87, ¶¶43, 48, 51 (Prosser, J., lead op.); in Subdiaz-Osorio, 2014 WI 87, ¶135 (Roggensack, J., concurring); State v. Brereton, 2013 WI 17, 345 Wis. 2d 563, 826 N.W.2d 369 (cited in Tate, majority op., ¶¶16-18, 40; in Subdiaz-Osorio, 2014 WI 87, ¶¶38, 49 (Prosser, J., lead op.); State v. Sveum, 2010 WI 92, 328 Wis. 2d 369, 787 N.W.2d 317 (cited in Tate, majority op., ¶¶14, 23, 28, 30, 40-43; in Subdiaz-Osorio, 2014 WI 87, ¶49 (Prosser, J., lead op.)).

conflict with each other.[21] The two opinions, as well as the separate writings in Subdiaz-Osorio of Justices Ann Walsh Bradley, N. Patrick Crooks, and Patience Drake Roggensack, must thus be read together carefully to understand the court's position on the constitutionality of law enforcement access to a person's cell phone location data.[22]

¶69 To address the overlapping issues raised by these two cases, I organize my dissenting opinions as follows. Each heading number corresponds to the relevant subdivision of each dissent.

¶70 In my dissent in Tate, I address the following main points:

> Part I. The police access to the defendant's cell phone location data, an issue in both Tate and Subdiaz-Osorio, was a search within the meaning of the Constitutions.[23]

---

[21] See Subdiaz-Osorio, 2014 WI 87, ¶¶131-132 (Roggensack, J., concurring) (criticizing Justice Prosser's lead opinion in Subdiaz-Osorio for "elaborate[ing] too fully on the Fourth Amendment implications of emerging technology before its role in society has become clear"); Subdiaz-Osorio, ¶50 (Prosser, J., lead op.) (noting that Tate shares similarities with Subdiaz-Osorio even though it is ultimately decided on other issues).

[22] In footnotes 23 through 30, I consolidate and summarize the position of each opinion in Tate and Subdiaz-Osorio regarding particular topics.

[23] For discussions of whether a search existed, see:

Tate, majority op., ¶26: Assumes, without deciding, that there was a search.

Subdiaz-Osorio, 2014 WI 87, ¶9 (Prosser, J., lead op.): Assumes, without deciding, that there was a search but hints strongly that a search existed.

Part II. The search existed as a trespass.[24]

Part III. The search existed as an invasion of an individual's reasonable expectation of privacy.

    A. The subjective expectation of privacy was not undermined by:

        1. The cell phone contract;[25] or

---

Subdiaz-Osorio, 2014 WI 87, ¶89 (Bradley, J., concurring), ¶116 (Crooks, J., concurring): Determine that there was a search.

Subdiaz-Osorio, 2014 WI 87, ¶¶131-137 (Roggensack, J., concurring): Criticizes Justice Prosser's lead opinion for elaborating too fully on right to privacy in cell phone location data.

Subdiaz-Osorio, 2014 WI 87, ¶139-143 (Ziegler, J., concurring): Joining Justice Roggensack's concurrence, and requesting additional briefing on whether a search existed.

Tate, Chief Justice Abrahamson's dissent, ¶61: Yes, access to cell phone location data is a search. See also Subdiaz-Osorio, 2014 WI 87, ¶155 (Abrahamson, C.J., dissenting).

[24] For discussions of whether a trespass existed, see:

Tate, majority op., ¶¶18-20: Discusses trespass but refers to the search only as "nontrespassory."

Subdiaz-Osorio, 2014 WI 87, ¶¶48-50 (Prosser, J., lead op.): Trespass analysis would be "unnatural."

Tate, Chief Justice Abrahamson's dissent, ¶¶101-102: State does not disclose how information was obtained; appears to be a trespass. See also Subdiaz-Osorio, 2014 WI 87, ¶168 (Abrahamson, C.J., dissenting).

[25] For discussions of whether the cell phone contract created consent to access the cell phone location data, see:

Tate, majority op., ¶22: Defendant might consent through purchase of cell phone.

2. The third-party doctrine.[26]

B. Society recognizes a reasonable expectation of privacy in cell phone location data.[27]

---

<u>Subdiaz-Osorio</u>, 2014 WI 87, ¶¶53-63 (Prosser, J., lead op.): Consent through cell phone purchase contract was invalid.

<u>Subdiaz-Osorio</u>, 2014 WI 87, ¶¶133-135 (Roggensack, J., concurring): Questions J. Prosser's lead opinion regarding contract.

<u>Tate</u>, Chief Justice Abrahamson's dissent, ¶116-121: Adhesion contract will not be enforced to waive constitutional rights. <u>See also</u> <u>Subdiaz-Osorio</u>, 2014 WI 87, ¶168 (Abrahamson, C.J., dissenting).

[26] For discussions of the impact of third-party doctrine, see:

<u>Tate</u>, majority op., ¶¶24-25: Third-party doctrine may need reevaluation.

<u>Subdiaz-Osorio</u>, 2014 WI 87, ¶134-135 (Roggensack, J., concurring): Questions whether expectation of privacy exists in third-party records.

<u>Tate</u>, Chief Justice Abrahamson's dissent, ¶¶122-135: Third-party doctrine in inapplicable to cell phone location data.

[27] For discussions of whether society recognizes a reasonable expectation of privacy, see:

<u>Tate</u>, majority op., ¶¶2, 16-25: Expectation of privacy may be lower for cell phone location, especially in a public area; expectation of privacy was dependent on the cell phone's location in a home.

<u>Subdiaz-Osorio</u>, 2014 WI 87, ¶¶65-68 (Prosser, J., lead op.): Public expects privacy in cell phone location data and worries about invasion of privacy.

<u>Subdiaz-Osorio</u>, 2014 WI 87, ¶134-135 (Roggensack, J., concurring): Questions whether expectation of privacy exists in third-party records.

Part IV. Wisconsin Stat. § 968.135, the statute setting forth the requirements for a subpoena of documents, should have been followed——it was not in either Tate or in Subdiaz-Osorio.[28]

¶71 In my dissent in Subdiaz-Osorio, I address two main points:

Part V. The State failed to meet its burden to demonstrate the existence of exigent circumstances;[29] and

---

Tate, Chief Justice Abrahamson's dissent, ¶¶136-149: Case law, public policy, and Wisconsin legislation point to society recognizing reasonable expectation of privacy in cell phone location data. See also Subdiaz-Osorio, 2014 WI 87, ¶168 (Abrahamson, C.J., dissenting).

[28] For discussions of the warrant requirement, see:

Tate, majority op., ¶¶33-50: Warrant did not comply with Wis. Stat. § 968.135, subpoena for third-party information. Non-statutory warrant met constitutional requirements. Non-statutory warrants met "spirit" of warrant statutes.

Subdiaz-Osorio, 2014 WI 87, ¶5 n.2 (Prosser, J., lead op.): No warrant at issue, but warrants must meet Fourth Amendment and statutory requirements.

Subdiaz-Osorio, 2014 WI 87, ¶89 (Bradley, J., concurring): A warrant was needed and the State's warrant failed to comply in either case.

Subdiaz-Osorio, 2014 WI 87, ¶118 (Crooks, J., concurring): A warrant was needed but the good-faith exception applied.

Tate, Chief Justice Abrahamson's dissent, ¶¶150-163: State fails to comply with statutory warrant requirements. Warrant was invalid. See also Subdiaz-Osorio, 2014 WI 87, ¶168 (Abrahamson, C.J., dissenting).

[29] For discussions of exigent circumstances, see:

Tate: Exigent circumstances not at issue.

11

Part VI. The defendant invoked his _Miranda_ right to an attorney at his interrogation.[30]

¶72 My discussion in Parts I-IV of my _Tate_ dissent is relevant to _Subdiaz-Osorio_, and I incorporate Parts I-IV of my

---

_Subdiaz-Osorio_, 2014 WI 87, ¶¶69-81 (Prosser, J., lead op.): Exigent circumstances exception to warrant requirement was satisfied.

_Subdiaz-Osorio_, 2014 WI 87, ¶89 (Bradley, J., concurring): there were no exigent circumstances.

_Subdiaz-Osorio_, 2014 WI 87, ¶118 (Crooks, J., concurring): there were no exigent circumstances.

_Subdiaz-Osorio_, 2014 WI 87, ¶130 (Roggensack, J., concurring): Law enforcement acted reasonably under the Fourth Amendment due to exigent circumstances.

_Subdiaz-Osorio_, 2014 WI 87, ¶¶169-208 (Abrahamson, C.J., dissenting): State fails to meet its burden to show exigent circumstances.

[30] For discussions of the _Miranda_ right to an attorney, see:

_Tate_: _Miranda_ rights not at issue.

_Subdiaz-Osorio_, 2014 WI 87, ¶¶82-87 (Prosser, J., lead op.): Defendant failed to invoke unequivocally right to an attorney.

_Subdiaz-Osorio_, 2014 WI 87, ¶89 (Bradley, J., concurring): Defendant successfully invoked _Miranda_ right.

_Subdiaz-Osorio_ 2014 WI 87, ¶109 (Crooks, J., concurring); _id._, ¶130 (Roggensack, J., concurring): Defendant failed to invoke unequivocally right to an attorney.

_Subdiaz-Osorio_, 2014 WI 87, ¶¶209-219 (Abrahamson, C.J., dissenting): A reasonable person would understand Subdiaz-Osorio to have invoked his _Miranda_ right.

Tate dissent into my Subdiaz-Osorio dissent without repeating them in full.[31]

¶73 Accordingly, I dissent in both cases.

I

¶74 The majority opinion in Tate and Justice Prosser's lead opinion in Subdiaz-Osorio do not answer the core question presented: Does law enforcement's access to an individual's cell phone location data in the present cases constitute a

---

[31] The two cases raise numerous additional issues that I do not address, including the applicability of federal statutes, the good-faith exception, and the proper standard for reviewing and remedying an illegal search of cell phone location data.

Justice Crooks' concurrence in Subdiaz-Osorio asserts that an illegal warrantless search occurred, Subdiaz-Osorio, 2014 WI 87, ¶¶125-128 (Crooks, J., concurring), but that the good-faith exception applies, and that the evidence should not have been excluded. As I explain in Parts I-IV, our state's case law already set forth the need for a warrant and the statutes provide procedures for obtaining a warrant. These rules of law existed at the time that the officers initiated the search in the instant cases.

I am unconvinced that the usual harmless-error analysis is the proper approach in Tate and Subdiaz-Osorio. See Subdiaz-Osorio, 2014 WI 87, ¶¶97-105 (Bradley, J., concurring) (applying harmless-error analysis in Subdiaz-Osorio). When illegally obtained cell phone location data forms the entire basis for the apprehension and arrest of the defendant, rather than evidence of the crime, the usual harmless-error analysis appears to be a poor fit.

13

search under the Wisconsin and United States Constitutions? I would answer this important question in the affirmative.[32]

¶75 The various opinions in Tate and Subdiaz-Osorio disagree about the impact of the recent United States Supreme Court case Riley v. California, 573 U.S. ___, 134 S. Ct. 2473 (2014). Riley held that law enforcement must obtain a warrant before searching the contents of a cell phone in a search incident to arrest. The Riley opinion extolled the strong privacy interests of individuals in electronic data stored, accessed, or maintained on cell phones.

---

[32] In Earls, 70 A.3d 630, although the New Jersey Supreme Court recognized the difficulty of calculating exactly what level of privacy society expects in its technological products, the court declared that individuals have a reasonable expectation of privacy in their cell phone location data, and therefore the police must obtain a search warrant before accessing that information.

> [O]ur focus belongs on the obvious: cell phones are not meant to serve as tracking devices to locate their owners wherever they may be. People buy cell phones to communicate with others, to use the Internet, and for a growing number of other reasons. But no one buys a cell phone to share detailed information about their whereabouts with the police.

Earls, 70 A.3d at 643.

Similarly, the Massachusetts Supreme Judicial Court has held that an individual's privacy interest in cell phone location data is one that society accepts as reasonable, and that law enforcement's request for cell phone location data from an individual's cell phone provider is a search requiring Fourth Amendment protections. Commonwealth v. Augustine, 4 N.E.3d 846 (Mass. 2014).

Recently, the federal Eleventh Circuit Court of Appeals has also held that cell phone location data is within society's reasonable expectation of privacy. See United States v. Davis, ___ F.3d ___, 2014 WL 2599917 (11th Cir. 2014).

14

¶76 The majority opinion in Tate and Justice Prosser's lead opinion in Subdiaz-Osorio distinguish Riley by stating that Riley does not address the instant question: whether a defendant has a reasonable expectation of privacy in location data. They relegate Riley to a footnote.[33] Conversely, Justice Crooks' concurrence in Subdiaz-Osorio relies heavily on Riley for its statements on the privacy interests of individuals in cell phone data to determine that police access of cell phone location data constitutes a search.[34]

¶77 The issue in the instant case of whether access of cell phone location data constitutes a search was not before the Court in Riley. I do not rely on Riley's holding regarding search incident to arrest in my analysis. The language in Riley is, however, instructive in the instant case. I draw from the teachings of Fourth Amendment case law of both Wisconsin and the United States regarding privacy interests to analyze whether a search occurred within the meanings of the Wisconsin and United States Constitutions in the present case. I analyze and apply the case law using both the trespass and the reasonable expectation of privacy doctrines applicable to the Fourth Amendment.

¶78 The case law of our state already provides us with ample basis to determine that the law enforcement access in Tate

---

[33] Tate, majority op., ¶20 n.11; Subdiaz-Osorio, 2014 WI 87, ¶47 n.23 (Prosser, J., lead op.).

[34] Subdiaz-Osorio, 2014 WI 87, ¶109 (Crooks, J., concurring).

15

and Subdiaz-Osorio constituted searches within the meaning of the Constitutions.

¶79 In State v. Brereton,[35] the court forcefully declared that law enforcement access and monitoring of an individual's location data through the use of a Global Positioning Systems (GPS) device on a motor vehicle is a search within the meaning of the Constitutions.[36] If the collection of location data via a GPS device attached to a motor vehicle is a search, then government acquisition of more invasive cell phone location data is a search. Cell phone location data is often more sophisticated and precise, and cell phones' ubiquity raises greater privacy concerns than GPS tracking of a motor vehicle.

¶80 The Brereton court explained that "warrantless GPS tracking would constitute a search even in the absence of a trespass, [because] a Fourth Amendment search occurs when the government violates a subjective expectation of privacy that society recognizes as reasonable."[37]

¶81 If there was any doubt that the Brereton court held that the GPS tracking of location data was a search within the meaning of the Constitutions, the Brereton court added:

---

[35] State v. Brereton, 2013 WI 17, 345 Wis. 2d 563, 826 N.W.2d 369, cert. denied, 134 S. Ct. 93 (U.S. 2013).

[36] Although the court is not bound by a party's concession of law, both the State's and defendant's briefs in Tate assert that Brereton, 345 Wis. 2d 563, makes clear that the GPS tracking was a search within the meaning of the Constitutions and required a warrant. Brief of Plaintiff-Respondent at 14-15; Brief and Appendix of Defendant-Appellant-Petitioner at 24-25.

[37] Brereton, 345 Wis. 2d 563, ¶34 (internal quotation marks omitted).

16

The privacy interest at issue . . . , where the government has utilized [the defendant's] property to apply GPS technology to monitor his movements, is government usurpation of an individual's property "for the purpose of conducting surveillance on him, thereby invading privacy interests long afforded, and undoubtedly entitled to, Fourth Amendment protection."[38]

¶82 Brereton relied on United States v. Jones, 565 U.S. ___, 132 S. Ct. 945 (2012), in which the United States Supreme Court unanimously determined that the attachment of a GPS device to a motor vehicle was a search under the United States Constitution, with three separate opinions reaching their conclusions by relying on different Fourth Amendment doctrines.

¶83 Jones is instructive in the instant case. The Jones majority opinion, authored by Justice Scalia and joined by four other Justices, held that the attachment of the GPS device constituted a trespass onto the defendant's property.[39] Justice Alito, in a concurrence joined by three other Justices, asserted that extensive recording of an individual's location "impinges on expectations of privacy."[40] Justice Sotomayor joined the majority opinion relying on trespass law but wrote a separate concurrence, asserting that although trespass doctrine settled the case in Jones, even short-term monitoring of an individual's

---

[38] Id. (citing Jones, 132 S. Ct. at 954).

The Brereton court clearly stated numerous times that "the use of a GPS device constituted a search . . . ," Brereton, 345 Wis. 2d 563, ¶43, and that "the privacy interest implicated by the GPS search required judicial authorization," id., ¶44.

[39] Jones, 132 S. Ct. at 949-54.

[40] Jones, 132 S. Ct. at 964 (Alito, J., concurring in the judgment).

17

location implicates the right to privacy.[41] Thus, five Justices viewed the GPS device and its tracking of an individual's location as impinging on expectations of privacy.

¶84 Our case law also recognizes that government access to data stored on cell phones[42] and personal computers[43] constitutes a search within the meaning of the Constitutions. Thus, even if law enforcement officers have consent to search an area, "an independent analysis" must be performed to determine whether a personal electronic device can also be searched.[44]

¶85 I agree with the statements in Justice Prosser's lead opinion in Subdiaz-Osorio on the importance of privacy and its relationship to our modern, interconnected, electronic-device-mediated world. "Privacy is a pillar of freedom."[45] "[P]rivacy serves more than the individual; it is an integral component of a well-ordered society."[46] "[P]rivacy must not become a legal fiction."[47] "[E]fforts to access the information in our electronic devices invade and expose the marrow of our

---

[41] Jones, 132 S. Ct. at 954-57 (Sotomayor, J., concurring).

[42] State v. Carroll, 2010 WI 8, ¶27, 322 Wis. 2d 299, 778 N.W.2d 1. See Riley, 134 S. Ct. 2473 (requiring warrant for officers to search the cell phone of an arrestee).

[43] State v. Sobczak, 2013 WI 52, 347 Wis. 2d 724, 833 N.W.2d 59, cert. denied sub nom. Sobczak v. Wisconsin, 134 S. Ct. 626 (2013).

[44] Sobczak, 347 Wis. 2d 724, ¶30.

[45] Subdiaz-Osorio, 2014 WI 87, ¶40 (Prosser, J., lead op.).

[46] Id., ¶41 (Prosser, J., lead op.).

[47] Id., ¶40 (Prosser, J., lead op.).

individuality."[48]   I, like Justice Prosser, am "mindful of the pervasiveness of wireless technology and of our citizens' concern for their privacy . . . ."[49]

¶86 As the United States Supreme Court recently noted in Riley, 134 S. Ct. at 2494-95, cell phones involve a privacy interest far beyond what the Founders envisioned:

> Modern cell phones are not just another technological convenience.  With all they contain and all they may reveal, they hold for many Americans "the privacies of life," [Boyd v. United States, 116 U. S. 616, 625 (1886).] The fact that technology now allows an individual to carry such information in his hand does not make the information any less worthy of the protection for which the Founders fought.

¶87 In light of these twenty-first-century privacy concerns and our existing case law holding that law enforcement's access to an individual's electronic data for information about the individual's location constitutes a search within the meaning of the Constitutions, why do the majority opinion in Tate and Justice Prosser's lead opinion in Subdiaz-Osorio hedge their bets?   Indeed, Justice Roggensack's concurrence in Subdiaz-Osorio chides Justice Prosser's lead opinion in Subdiaz-Osorio for daring to even insinuate that a privacy interest might exist in cell phone location data.[50]

¶88 The majority opinion in Tate and Justice Prosser's lead opinion in Subdiaz-Osorio assert that they choose not to

---

[48] Id., ¶42 (Prosser, J., lead op.).

[49] Id., ¶45 (Prosser, J., lead op.).

[50] Subdiaz-Osorio, 2014 WI 87, ¶¶131-132, 139-137 (Roggensack, J., concurring).

decide whether the accessing of cell phone location data constituted searches within the meaning of the Constitutions because of "caution" as urged by the United States Supreme Court in City of Ontario, Cal. v. Quon, 560 U.S. 746, 759 (2010). Tate, majority op., ¶26; Subdiaz-Osorio, 2014 WI 87, ¶64 (Prosser, J., lead op.). Justice Prosser's lead opinion in Subdiaz-Osorio recites language from Quon stating that "[a] broad holding concerning employees' privacy expectations vis-à-vis employer-provided technological equipment might have implications for future cases that cannot be predicted." Subdiaz-Osorio, 2014 WI 87, ¶64 (Prosser, J., lead op.) (quoting Quon, 560 U.S. at 760).

¶89 Contrary to the hand-wringing of the majority opinion in Tate and Justice Prosser's lead opinion in Subdiaz-Osorio, recognizing a privacy interest in cell phone location data in the present cases does not establish far-reaching premises that define the existence and extent of privacy expectations for all technology. The court would establish only that government access to cell phone location data by the means used in these cases constitutes a search within the meaning of the Constitutions.

¶90 Technology does change rapidly, but the caution urged by Quon should hedge in favor of our protecting privacy in the fact situations presented to us. Caution should steer us to follow existing Wisconsin case law already recognizing that government tracking of an individual's cell phone location data constitutes a search.

20

¶91 Regardless of whether one applies the trespass doctrine or the reasonable expectation of privacy doctrine of Fourth Amendment jurisprudence, law enforcement access to the defendants' cell phone location data in both Tate and Subdiaz-Osorio constitutes a search within the meaning of the Constitutions.

¶92 I nonetheless analyze both cases through the Fourth Amendment lenses of both the trespass doctrine and the reasonable expectation of privacy doctrine.

II

¶93 Under the trespass doctrine, when the government intrudes upon private property, even if the intrusion is small, it has performed a search within the meaning of the Constitutions.[51]

¶94 The Jones majority opinion held that when law enforcement "physically occupied private property for the purpose of obtaining information," a trespassory search occurred for Fourth Amendment purposes. Jones, 132 S. Ct. at 949-51.

¶95 As Justice Alito notes in his concurrence in Jones, "some [courts] have held that even the transmission of electrons that occurs when a communication is sent from one computer to another is enough" to constitute a trespass.[52]

---

[51] See Silverman v. United States, 365 U.S. 505, 512 (1961) ("mildest and least repulsive" trespass is still a search).

[52] Jones, 132 S. Ct. at 962 (Alito, J., concurring) (citing CompuServe, Inc. v. Cyber Promotions, Inc., 962 F. Supp. 1015, 1021 (S.D. Ohio 1997); Thrifty-Tel, Inc. v. Bezenek, 46 Cal. App. 4th 1559, 1566 n.6 (1996)).

¶96 The defendant's cell phone is private personal property, a constitutionally protected personal "effect".[53] A physical intrusion into that property with intent to find information creates a trespassory search.[54]

¶97 In both Tate and Subdiaz-Osorio, the police received the defendant's cell phone location data from the cell phone service provider, but nowhere in either case is it disclosed exactly how the cell phone location data was accessed.[55]

---

See also Jones, 132 S. Ct. at 953 ("Situations involving merely the transmission of electronic signals without trespass would remain subject to Katz analysis."). The lead opinion in Subdiaz-Osorio quotes this language for the proposition that applying trespass doctrine to electronic data would be "unnatural," see Subdiaz-Osorio, 2014 WI 87, ¶48 & n.24 (Prosser, J., lead op.), but Jones does not foreclose that transmission of electronic signals may at times constitute a trespass.

[53] See Carroll, 322 Wis. 2d 299, ¶¶27-28 (treating a cell phone as a closed container).

[54] Courts have treated government intrusions into stored data on computers as trespasses to a chattel ("an effect" under the Fourth Amendment). See Sotelo v. DirectRevenue, LLC, 384 F. Supp. 2d 1219, 1230-32 (N.D. Ill. 2005) (asserting that intrusion into a computer causing damage to the computer was sufficient to state a claim for trespass to chattels); see also Theofel v. Farey-Jones, 359 F.3d 1066, 1072-73 (9th Cir. 2004) (analogizing violation of the federal Stored Communications Act with the common law of trespass); International Ass'n of Machinists and Aeropsace Workers v. Werner-Masuda, 390 F. Supp. 2d 479, 495 (D. Md. 2005) (noting that federal courts treat computer hackers as "electronic trespassers").

[55] "It is not clear from the record exactly how law enforcement used cell site information . . . ." Tate, majority op., ¶8.

¶98 In both Tate and Subdiaz-Osorio, the government apparently electronically intruded into the defendant's cell phone by use of either a "ping" from the cell phone company[56] or a "stingray" device,[57] both of which implicate a trespassory search.

¶99 If the cell phone location data was accessed when the cell phone service provider "pinged" the phone, i.e., actively sent a signal to trigger the phone to reveal its location, the entry of an electronic signal into the phone implicated a trespass.

¶100 If the cell phone location data was accessed through law enforcement use of a "stingray" device as in Tate, such use also implicated a trespass.[58]

_____

The circuit court order issued in Tate required that the service provider, U.S. Cellular, "shall initiate a signal to determine the location of the subject's mobile device on the service provider's network or with such other reference points as may be reasonable . . . ."

[56] Tate, majority op., ¶¶1, 7; Subdiaz-Osorio, 2014 WI 87 ¶45 n.19 (Prosser, J., lead op.).

[57] Tate, majority op., ¶¶1, 7, 9.

[58] A stingray works by mimicking a cellphone tower, getting a phone to connect to it and measuring signals from the phone. It lets the stingray operator 'ping,' or send a signal to, a phone and locate it as long as it is powered on, according to documents reviewed by the Journal. The device has various uses, including helping police locate suspects and aiding search-and-rescue teams in finding people lost in remote areas or buried in rubble after an accident.

Jennifer Valentino-Devries, "Stingray" Phone Tracker Fuels Constitutional Clash, Wall St. J., Sept. 22, 2011, available at http://online.wsj.com/news/articles/SB10001424053111904194604576 583112723197574 (last visited July 14, 2014).

23

¶101 The exact methodology of the "stingray" is of some secrecy, but a general understanding of its functioning exists. Apparently the stingray device mimics a cell tower and sends a signal into the cell phone to trigger a response. The manufacturers of stingray devices will not discuss how the technology works. The Wisconsin Department of Justice uses stingray technology but refuses to disclose the functioning or use of the stingray device.[59]

¶102 Even though the State has failed to disclose how the cell phone location data was obtained in the two cases, it appears that the government access to cell phone location data in both cases implicated trespassory intrusions. Nevertheless,

---

[59] See Eric Litke, State Cops Can Track Residents' Cellphones, Oshkosh Northwestern, Mar. 28, 2014, available at http://www.thenorthwestern.com/article/20140331/OSH0198/303290107/State-cops-can-track-residents-cellphones (last visited July 14, 2014).

Increasingly, local and state law enforcement officers are tapping into cell phone data using a variety of tools including stingray devices. Use of these secretive tools has raised privacy concerns in many jurisdictions. See John Kelly, Cellphone Data Spying: It's Not Just the NSA, USA Today, June 10, 2014, available at http://www.usatoday.com/story/news/nation/2013/12/08/cellphone-data-spying-nsa-police/3902809/ (last visited July 14, 2014).

Additionally, the Obama administration has encouraged state and local law enforcement to withhold or heavily censor documents regarding the use of cell phone surveillance tools, increasingly intervening in routine state public records cases and criminal trials regarding use of the technology. See Jack Gillum & Eileen Sullivan, US Pushing Local Cops To Stay Mum on Surveillance, U.S. News & World Report, June 12, 2014, available at http://www.usnews.com/news/politics/articles/2014/06/12/us-pushing-local-cops-to-stay-mum-on-surveillance (last visited July 14, 2014).

the majority opinion in Tate and Justice Prosser's lead opinion in Subdiaz-Osorio do not consider trespass relevant to their inquiries.

¶103 The majority opinion in Tate simply ignores the possibility that the intrusion in the instant case constituted a trespassory search. The Tate majority opinion, ¶¶18-19, analyzes the case as one in which "physical trespass on a defendant's property does not apply" or one involving "the absence of a trespass."

¶104 Justice Prosser's lead opinion in Subdiaz-Osorio asserts, without citation to any authority or analysis of the electronic intrusion, that the intrusion did not constitute a trespass.[60] Justice Prosser's lead opinion in Subdiaz-Osorio concludes that holding electronic manipulation to be a trespass "would be unnatural."[61]

¶105 Justice Prosser's lead opinion in Subdiaz-Osorio does not explicate what makes electronic manipulation "unnatural" and cites no cases or authority for its proposition, simply stating, ipse dixit, that "the present case falls under the category of a non-trespassory search . . . ."[62] The basis for the lead opinion's reasoning remains a mystery.

¶106 The court imprudently assumes that no trespass existed in the two cases. The determination of trespass should be based on the State's disclosure of how it obtained the information.

---

[60] Subdiaz-Osorio, 2014 WI 87, ¶50 (Prosser, J., lead op.).

[61] Id., ¶48 (Prosser, J., lead op.).

[62] Id., ¶49 (Prosser, J., lead op.).

25

Any electronic signal entering the individual's phone and modifying it or triggering a response in any way, however slight, implicates a trespassory search.

III

¶107 Justice Prosser's lead opinion in Subdiaz-Osorio correctly recites the two-part test set out in Katz v. United States, 389 U.S. 347 (1967), of the "reasonable expectation of privacy" standard for what constitutes a search within the meaning of the Constitution.[63]

¶108 Katz states that a search occurs when a person has both: a) a subjective expectation of privacy; and b) an expectation of privacy "that society is prepared to recognize as 'reasonable.'" Katz, 389 U.S. 347, 361 (Harlan, J., concurring).[64]

¶109 Justice Prosser's lead opinion in Subdiaz-Osorio explains why the individual defendant in that case had a subjective expectation of privacy in cell phone location data, Subdiaz-Osorio, 2014 WI 87, ¶53-64 (Prosser, J., lead op.), and why society recognizes an expectation of privacy in cell phone location data, Subdiaz-Osorio, 2014 WI 87, ¶¶42, 45, 65-68 (Prosser, J., lead op.). Yet, in the end, Justice Prosser's lead opinion in Subdiaz-Osorio refuses to recognize an individual's right to privacy in cell phone location data.

_____

[63] Id., ¶¶51-52 (Prosser, J., lead op.).

[64] The United States Supreme Court has acknowledged that the Katz test "has often been criticized as circular, and hence subjective and unpredictable." Kyllo v. United States, 533 U.S. 27, 34 (2001).

26

¶110 I would hold that the government access to cell phone location data in both cases violated both the subjective and objective reasonable expectations of privacy.

A

¶111 In order to determine whether government access to cell phone location data constitutes a search within the meaning of the Constitutions, a court addresses the first prong of the Katz test, namely that the person must have a subjective expectation of privacy in the area being searched.

¶112 Although individuals may be generally aware that their locations may be tracked through their cell phones, most do not realize the extent of tracking possible[65] and reasonably do not

---

[65] If you have a cell phone in your pocket, then the government can watch you. At the government's request, the phone company will send out a signal to any cell phone connected to its network, and give the police its location. [In 2009] law enforcement agents pinged users of just one service provider——Sprint—— over eight million times. The volume of requests grew so large that the 110-member electronic surveillance team couldn't keep up, so Sprint automated the process by developing a web interface that gives agents direct access to users' location data. Other cell phone service providers are not as forthcoming about this practice, so we can only guess how many millions of their customers get pinged by the police every year.

United States v. Pineda-Moreno, 617 F.3d 1120, 1125 (9th Cir. 2010) (Kozinski, J., dissenting) (citations omitted).

The Tate warrant approves collecting open-ended and undefined data from the cell phone service provider, such as: "any historical information law enforcement may request to include historical cell site information from 6/9/2009 through this order's duration . . . ." The order's duration extends over a long period of time——60 days——and requires that the cell phone service provider "shall provide all technical assistance necessary to accomplish this order and disclose the records and other information described herein twenty-four hours a day."

27

expect the cell phone service provider to report their precise location to law enforcement officers. It does not comport with the reality of the modern telecommunications age that individuals lose their constitutional right to privacy in their location simply by purchasing a cell phone.

¶113 In accord with the comments in Justice Prosser's lead opinion in Subdiaz-Osorio,[66] I would hold that the defendants had a subjective reasonable expectation of privacy in the cell phone location data.

¶114 I turn to the questions of whether the cell phone service provider's contract or an individual's disclosure of his cell phone location data to the cell phone service provider (a third party) undermined the individual's subjective expectation of privacy in cell phone location data.

1

¶115 The cell phone service provider contract is referenced in Justice Prosser's lead opinion in Subdiaz-Osorio. The State argues that the contract removes the defendant's subjective expectation of privacy in his cell phone location data.

¶116 I conclude that the contract in question in Subdiaz-Osario was a contract of adhesion, a "take-it-or-leave-it"

---

This surveillance goes far beyond the traditional scope of a search warrant, aided by technology that has now rendered broad searches practicable.

[66] Subdiaz-Osorio, 2014 WI 87, ¶¶53-61 (Prosser, J., lead op.).

contract that the individual could not and did not negotiate.[67] Consequently, I would at a minimum construe ambiguous or vague terms against the drafter.[68]

¶117 Justice Prosser's lead opinion in Subdiaz-Osorio points out a variety of potentially unclear language in the defendant's cell phone service provider contract. Subdiaz-Osorio, ¶¶56-58 (Prosser, J., lead op.).

¶118 Justice Prosser's lead opinion in Subdiaz-Osorio also avers that such a complex and potentially confusing contract should not constitute the basis for consent to a search. Subdiaz-Osorio, 2014 WI 87, ¶59 (Prosser, J., lead op.). Why not? Law enforcement officers are already expected to navigate a thicket of case law and facts when performing a consent search. The "totality of the circumstances" analysis when determining whether consent to a search has been properly given often involves careful weighing of a variety of legal

---

[67] See Wis. Auto Title Loans v. Jones, 2006 WI 53, ¶52, 290 Wis. 2d 514, 714 N.W.2d 155 (quoting Acorn v. Household Int'l, Inc., 211 F. Supp. 2d 1160, 1168 (N.D. Cal. 2002)).

[68] "The principle that ambiguities are construed against the drafter is a deeply rooted doctrine of contract interpretation." Maryland Arms Ltd. P'ship v. Connell, 2010 WI 64, ¶44, 326 Wis. 2d 300, 786 N.W.2d 15 (internal quotation marks omitted).

relationships between family members, romantic partners, roommates, landlords and tenants, etc.[69]

¶119 I also look, as I have stated previously, to the reality of cell phone usage by the everyday purchaser of a cell phone: When accepting an adhesion contract to purchase cell phone service——an increasingly necessary component of everyday life——the purchaser is not bargaining for unfettered government access to the purchaser's cell phone location data.

¶120 The breadth of the data covered by the contract and the lack of clarity regarding the circumstances enabling the cell phone service provider to transmit the data to the government mandate that the court hold that the purchaser did not consent to government access to his or her cell phone location data.

¶121 Thus, I conclude that the defendant in Subdiaz-Osorio did not relinquish his subjective expectation of privacy or

---

[69] See, e.g., State v. Kieffer, 217 Wis. 2d 531, 577 N.W.2d 352 (1998) (requiring police to ask additional clarifying questions when third-party landowner's apparent authority to search the tenant-defendant's apartment was unclear); State v. Tomlinson, 2002 WI 91, 254 Wis. 2d 502, 648 N.W.2d 367 (determining that police could reasonably assume that 14-year-old girl at the door of a residence had apparent authority to consent to its search even though they had no evidence that the girl was the resident's daughter); Sobczak, 347 Wis. 2d 724 (deeming it reasonable for police to assume that a defendant's girlfriend had actual authority to consent to a search of the defendant's laptop, even though the girlfriend was a houseguest and not a cotenant); State v. St. Germaine, 2007 WI App 214, 305 Wis. 2d 511, 740 N.W.2d 148 (holding that when a tenant-defendant did not object to the landlord's consent to search the entire residence, and when the police did not know that a particular room belonged to the tenant-defendant, the landlord had apparent authority to consent to the search).

30

consent to a search based on the cell phone service provider contract.

2

¶122 I turn now to the "third-party doctrine," which is often broadly stated as follows:  When an individual voluntarily provides information to a third party, the individual does not have a reasonable subjective expectation of privacy in the information.[70]

¶123 In the instant cases, the defendants' cell phones conveyed location information to the cell phone service provider, a third party, as a necessary component of the functioning of the phone.  The defendants apparently cannot opt out of giving this information to the service provider.

¶124 Thus the very use of the cell phone, as well as the contract with the cell phone service provider, implicates the third-party doctrine.

¶125 Justice Roggensack's concurrence in Subdiaz-Osorio opines that the defendants in Tate and Subdiaz-Osorio had no

---

[70] See United States v. Miller, 425 U.S. 435 (1976) (holding a bank depositor had no reasonable expectation of privacy in his or her bank records); Smith v. Maryland, 442 U.S. 735 (1979) (holding that use of a pen register, a device that records the phone numbers dialed by an individual, does not constitute a search under the reasonable expectation of privacy analysis).

Congress and many state legislatures, including the Wisconsin legislature, subsequently created a procedure for issuing pen registers that protects an individual's privacy interests.  See 18 U.S.C. § 3123 (2006); Wis. Stat. §§ 968.34-.36.  See also Right to Financial Privacy Act of 1978, 12 U.S.C §§ 3401-3421 (1980) (protections to prevent government access into private bank records without meeting specific requirements).

31

reasonable expectation of privacy because "a defendant typically retains no constitutional reasonable expectation of privacy in information conveyed to a third party." Subdiaz-Osorio, 2014 WI 87, ¶135 (Roggensack, J., concurring) (internal quotation marks & citation omitted); see also Tate, majority op., ¶25.

¶126 In the modern world, in which we regularly disclose information to third parties as part of everyday life, the third-party doctrine is ailing as a principle of law.

¶127 The third-party doctrine has been limited in scope since it was stated broadly in United States v. Miller, 425 U.S. 435, 443 (1976), a case that predates cellular phones. In Miller, the Court held that a bank depositor had no reasonable expectation of privacy in his or her bank records.

¶128 Smith v. Maryland, 442 U.S. 735 (1979), applied the reasoning of Miller, rejecting the argument that telephone subscribers harbor any general expectation that the numbers they dial, which are conveyed to the telephone company, will remain secret.

¶129 Miller and Smith represented the high-water mark for the third-party doctrine, which has receded ever since. Although the third-party doctrine has been defended vigorously by at least one prominent scholar, Orin Kerr, on the grounds that it provides clarity and ensures technological neutrality,[71] the Miller opinion was met with criticism as both overly broad and unsatisfactory in its failure to balance privacy rights of

---

[71] See Orin Kerr, The Case for the Third-Party Doctrine, 107 Mich. L. Rev. 561 (2009).

individuals against the law enforcement interest in investigating crimes.[72]

---

[72] See Note, Government Access to Bank Records, 83 Yale L.J. 1439, 1464-65 (1974) (criticizing the doctrine as outdated, and asserting that denial of a privacy interest in third-party records "leads to the anomalous conclusion that, while safeguarded against all others, the depositor's privacy would be nonexistent when the prying eye belongs to the government"); Albert W. Alschuler, Interpersonal Privacy and the Fourth Amendment, 4 N. Ill. U. L. Rev. 1, 22 (1983) (noting that reactions to Miller were "overwhelmingly negative" and decrying the alarming breadth of the third-party doctrine announced therein); Matthew Tokson, Automation and the Fourth Amendment; 96 Iowa L. Rev. 581, 585-86 (2011) (criticizing the third-party doctrine as "problematic in an age where an ever-growing proportion of personal communications and transactions are carried out over the Internet," all accessible to third-party Internet service providers, among others).

Professor LaFave has joined others in criticizing the third-party doctrine. 1 Wayne R. LaFave, Search & Seizure § 2.7(c) (5th ed. 2012) (footnotes omitted):

> The result reached in Miller is dead wrong, and the Court's woefully inadequate reasoning does great violence to the theory of Fourth Amendment protection the Court had developed in Katz.
>
> . . . .
>
> The Court's assertion in Miller that there can be no protected Fourth Amendment interest where there is "neither ownership nor possession" is contrary to the purposes underlying the Fourth Amendment, the teachings of Katz, and the realities of modern-day life. Ownership and possession are property concepts which, the Court wisely concluded in Katz, "cannot serve as a talismanic solution to every Fourth Amendment problem," and which surely do not lead to the proper solution in this context. Unquestionably, the "Fourth Amendment's drafters were . . . concerned with privacy in the sense of control over information."

¶130 Since Miller and Smith, courts have used the third-party doctrine with decreasing frequency and have limited third-party cases to the facts at hand, leading some commentators to deem the doctrine either dead or of limited viability.[73]

¶131 Either ignoring or contravening the third-party doctrine, courts now recognize a reasonable expectation of privacy in certain types of information regardless of their disclosure to third parties, such as health records,[74] heat emanating from a house,[75] files entrusted to an attorney by a client,[76] tax records entrusted to a tax preparer,[77] or e-mail records.[78]

---

[73] See, e.g., Stephen E. Henderson, After United States v. Jones, After the Fourth Amendment Third Party Doctrine, 14 N.C. J.L. & Tech. 431 (2013) (reasoning that courts have been hesitant to apply the third-party doctrine in recent years, and attacking the doctrine as incongruent with modern culture).

[74] In Ferguson v. City of Charleston, 532 U.S. 67 (2001), the Court recognized that pregnant women had a privacy interest in collected urine samples and invalidated a program that shared samples given at a hospital with law enforcement. The dissent, authored by Justice Scalia, noted that the Court did not address the third-party doctrine.

[75] Kyllo, 537 U.S. 27.

[76] DeMassa v. Nunez, 770 F.2d 1505 (9th Cir. 1985).

[77] People v. Gutierrez, 222 P.3d 925 (Colo. 2009).

[78] United States v. Warshak, 631 F.3d 266 (6th Cir. 2010) (asserting that an individual enjoys a reasonable expectation of privacy in e-mails vis-à-vis his or her internet service provider and that government agents violated the individual's Fourth Amendment rights by compelling disclosure of his emails from the internet service provider without a warrant).

¶132 Justice Sotomayor got it right in her concurrence in Jones, 132 S. Ct. at 957, which casts doubt on the continued viability of a broad third-party doctrine in the digital age:

> This approach is ill suited to the digital age, in which people reveal a great deal of information about themselves to third parties in the course of carrying out mundane tasks. People disclose the phone numbers that they dial or text to their cellular providers; the URLs that they visit and the e-mail addresses with which they correspond to their Internet service providers; and the books, groceries, and medications they purchase to online retailers. . . . . I for one doubt that people would accept without complaint the warrantless disclosure to the Government of a list of every Web site they had visited in the last week, or month, or year. But whatever the societal expectations, they can attain constitutionally protected status only if our Fourth Amendment jurisprudence ceases to treat secrecy as a prerequisite for privacy. I would not assume that all information voluntarily disclosed to some member of the public for a limited purpose is, for that reason alone, disentitled to Fourth Amendment protection.[79]

¶133 Although Justice Roggensack's concurrence in Subdiaz-Osorio reproaches Justice Prosser's lead opinion in Subdiaz-Osorio for "question[ing] the continued viability of the third party disclosure doctrine itself,"[80] the viability of the third-party disclosure doctrine is already questioned by existing case law and by Justice Sotomayor's concurrence in Jones, which the Tate majority opinion cites favorably.[81] Indeed, the Eleventh

---

[79] The third-party doctrine also arose in Riley, 134 S. Ct. at 2492-93. The Court did not adopt the government's argument to uphold the search based on the third-party doctrine as stated in Smith, 442 U.S. 735.

[80] Subdiaz-Osorio, 2014 WI 87, ¶135 (Roggensack, J., concurring).

[81] Tate, majority op., ¶25.

35

Circuit Court of Appeals has rejected the use of the third-party doctrine in evaluating whether government access to cell phone location data was a search, reasoning that because the defendant probably had no idea that he was allowing the cell phone provider to follow his movements, he "has not voluntarily disclosed his cell site location information to the provider in such a fashion as to lose his reasonable expectation of privacy." Davis, 2014 WL 2599917 at *10.

¶134 The ABA standards for law enforcement access to third-party records, cited favorably by Justice Roggensack's concurrence in Subdiaz-Osorio,[82] advocate a finer-grained approach to data disclosed to third parties, rejecting a broad third-party doctrine in favor of differing protections for differing levels of expected privacy in data.[83]

¶135 I conclude that neither defendant lost his expectation of privacy in his cell phone location data simply because the location data was disclosed to the cell phone service provider. People do not buy cell phones to have them serve as government tracking devices.

B

¶136 For several reasons I conclude that society recognizes a reasonable expectation of privacy in an individual's cell phone location data.

---

[82] Subdiaz-Osorio, 2014 WI 87, ¶135 (Roggensack, J., concurring).

[83] ABA Standards for Criminal Justice, Law Enforcement Access to Third Party Records Standard 25-4.1 & cmt., at 63 (3d ed. 2013).

¶137 First, the Wisconsin GPS case law (Brereton)[84] has recognized an individual's subjective expectation of privacy in the individual's location and has declared that government access to GPS location data is a search within the meaning of the Constitutions.[85] Justice Sotomayor's concurrence in Jones similarly recognizes that even short-term GPS monitoring can reveal a wealth of information about a person's private behavior that he or she chooses not to expose to the world at large and that society should protect this choice.[86]

¶138 Second, in addition to the case law determining that government access to an individual's GPS location data is a violation of an individual's objective reasonable expectation of privacy, state and federal laws have long protected individual communications and records disclosed to third parties from government access.

¶139 Our statutes recognize that individuals have a privacy interest in electronic and communications data, including oral, electronic, and wire communications;[87] dialed phone numbers;[88] and

---

[84] Brereton, 345 Wis. 2d 563.

[85] See ¶¶79-81, supra (discussing Brereton).

[86] Jones, 132 S. Ct. 945, 955-56 (2012) (Sotomayor, J., concurring).

[87] See Wis. Stat. § 968.31 (prohibiting the interception of wire, electronic, or oral communication, except as provided and authorized by judicial order)

[88] See Wis. Stat. § 968.34 (prohibiting any person, including law enforcement, from installing a pen register or trap-and-trace device absent a court order).

37

other records stored by communications services, such as name, address, session times and durations, billing information, etc.[89]

¶140 Third, society recognizes an individual's subjective reasonable expectation of privacy in location data regardless of whether the tracking is in public or private spaces.

¶141 The majority opinion in Tate suggests that tracking of cell phone location in Tate required a warrant "because the tracking led law enforcement to discover Tate's location within his mother's home."[90]  The Tate majority opinion cites United States v. Knotts, 460 U.S. 276, 281 (1983), and State v. Sveum, 2010 WI 92, ¶79, 328 Wis. 2d 369, 787 N.W.2d 317 (Ziegler, J., concurring) for the proposition that tracking in public places does not constitute a search.  Tate, majority op., ¶23.

¶142 Yet the facts of Tate and Subdiaz-Osorio demonstrate that the public/private space distinction has become blurry.  In Tate, when law enforcement officers initiated the tracking, they did not know whether the cell phone would be in public or private areas.  Stingray devices owned by law enforcement gather location information about a cell phone whether it is in a public or private space.  Similarly, the law enforcement officers did not know in Subdiaz-Osorio whether the defendant would be on a public highway or in a private residence (or similarly protected space, e.g., a hotel room).

---

[89] See Wis. Stat. § 968.375 (creating statutory subpoenas for disclosure of certain information by electronic communications services and prohibiting disclosure unless the disclosure fits into certain exceptional categories).

[90] Tate, majority op., ¶2; see also id., ¶¶23, 51.

¶143 True, in older jurisprudence, the United States Supreme Court distinguished between police surveillance of location in which the tracking device entered a home and surveillance in which the tracking device monitored movements only in public spaces. Compare Knotts, 460 U.S. at 281–83 (no Fourth Amendment violation when beeper surveillance on a vehicle tracked the vehicle on public streets and highways) with United States v. Karo, 468 U.S. 705, 714 (1984) (warrant was required to use a beeper to monitor the location of a container that was inside a vehicle on public roads, and then moved inside a private space).

¶144 This distinction between tracking in public and private spaces is eroded in the case of cell phone location data, which can be used to track movements across both public and private spaces.

¶145 This difficulty does not erode core privacy protections of residences. In Tate, upon determining the location of the phone, law enforcement officers entered the home of the defendant's mother. Entry into the home was a search separate and distinct from law enforcement's access to the cell phone location data. The warrantless entry into the home was not covered by the warrant in Tate, which authorized the officers to search only for the location data. Rather, the warrantless entry into the home was based on consent, an exception to the warrant requirement.[91] Simply because new

---

[91] The defendant in Tate disputed the issue of consent at the circuit court, but did not raise the issue in this court.

technology reveals new areas of privacy does not mean that existing privacy interests are lost.[92]

¶146 Fourth, the Wisconsin legislature has recognized the public's reasonable expectation of privacy in cell phone location data. The Wisconsin legislature has recently enacted 2013 Wis. Act 375, creating Wis. Stat. § 968.373 (2013-14), with support across ideological and partisan lines.[93]

¶147 Newly enacted Wis. Stat. § 968.373, reprinted as an appendix, contains protections for location data from wireless or mobile devices. Subsection 968.373(2) explicitly prohibits law enforcement from identifying or tracking the location of a communications device without first obtaining a warrant as defined by the statute:

> PROHIBITION. Except as provided in sub. (8) [the statutory emergency exception], no investigative or law enforcement officer may identify or track the location of a communications device without first obtaining a warrant under sub. (4).

By creating this statute, the Wisconsin legislature has reflected society's willingness to recognize the individual's subjective expectation of privacy.

¶148 Although the new legislation post-dates the searches in Tate and Subdiaz-Osorio, this court has examined legislation

---

[92] See Kyllo, 533 U.S. at 37-40 (noting that although heat-imaging technology was novel, core protections of privacy in homes remained intact).

[93] Of the bill's 22 Assembly sponsors, 14 were Republicans and 8 were Democrats. The bill's two co-sponsors in the Senate were John Lehman (D-Racine) and Glenn Grothman (R-West Bend). It was also unanimously approved by the Wisconsin Assembly Committee on Judiciary.

not applicable to the case before it to help us understand the state's public policy. See Kimble v. Land Concepts, Inc., 2014 WI 21, ¶65 n.24, 353 Wis. 2d 377, 845 N.W.2d 395 ("While the statute is not applicable to this case, it is nonetheless appropriate to consider the legislature's judgment of a reasonable disparity of punitive to compensatory damages."); McGarrity v. Welch Plumbing Co., 104 Wis. 2d 414, 427, 312 N.W.2d 37 (1981) (interpreting purpose of child labor laws based on later enactments on the same topic).

¶149 For all these reasons, I conclude that society is willing to recognize as reasonable and protect individuals' subjective reasonable expectation of privacy in cell phone location data.

IV

¶150 Because I conclude that in both Tate and Subdiaz-Osorio the government's access to the defendant's cell phone location data was a search within the meaning of the Constitutions, the warrant requirement applies. Thus, law enforcement needed a valid warrant to access the defendants' cell phone location data. In Tate, no warrant was obtained in compliance with the state statutes. No warrant was obtained at all in Subdiaz-Osorio.[94]

---

[94] Justice Prosser's lead opinion in Subdiaz-Osorio does, however, comment on warrant requirements, although its precise meaning for courts and law enforcement is unclear:

A court order that meets the requirements of the Fourth Amendment may function as a warrant. State v. Tate, 2014 WI 89, ¶2 & n.4, ___ Wis. 2d ___, ___ N.W.2d ___; see also State v. Sveum, 2010 WI 92, ¶39, 328 Wis. 2d 369, 787 N.W.2d 317. However, when a

¶151 Our state legislature has promulgated statutes governing search warrants since 1849.[95]

¶152 Existing statutes governing warrants apply directly to a search for cell phone location data held by a cell phone provider, as the Tate majority opinion concedes.[96] The Tate majority opinion states that existing warrant statutes, Wis. Stat. §§ 968.12[97] and 968.135,[98] are clear and directly on point,

---

statute provides procedures for obtaining a warrant in a given set of circumstances, law enforcement should follow the statute to ensure that a search conducted under the circumstances contemplated by the statute does not violate a person's Fourth Amendment rights.

Subdiaz-Osorio, 2014 WI 87, ¶5 n.2 (Prosser, J., lead op.).

[95] See Wis. Stat. ch. 142, §§ 1-4 (1849).

[96] Tate, majority op., ¶¶45-50.

[97] Wisconsin Stat. § 968.12 states as follows:

**Search warrant**

**(1) Description and issuance.** A search warrant is an order signed by a judge directing a law enforcement officer to conduct a search of a designated person, a designated object or a designated place for the purpose of seizing designated property or kinds of property. A judge shall issue a search warrant if probable cause is shown.

**(2) Warrant upon affidavit.** A search warrant may be based upon sworn complaint or affidavit, or testimony recorded by a phonographic reporter or under sub. (3)(d), showing probable cause therefor. The complaint, affidavit or testimony may be upon information and belief.

**(3) Warrant upon oral testimony.** (a) *General rule.* A search warrant may be based upon sworn oral testimony communicated to the judge by telephone, radio or other means of electronic communication, under the procedure prescribed in this subsection.

(b) *Application.* The person who is requesting the warrant shall prepare a duplicate original warrant and read the duplicate original warrant, verbatim, to the judge. The judge shall enter, verbatim, what is read on the original warrant. The judge may direct that the warrant be modified.

(c) *Issuance.* If the judge determines that there is probable cause for the warrant, the judge shall order the issuance of a warrant by directing the person requesting the warrant to sign the judge's name on the duplicate original warrant. In addition, the person shall sign his or her own name on the duplicate original warrant. The judge shall immediately sign the original warrant and enter on the face of the original warrant the exact time when the warrant was ordered to be issued. The finding of probable cause for a warrant upon oral testimony shall be based on the same kind of evidence as is sufficient for a warrant upon affidavit.

(d) *Recording and certification of testimony.* When a caller informs the judge that the purpose of the call is to request a warrant, the judge shall place under oath each person whose testimony forms a basis of the application and each person applying for the warrant. The judge or requesting person shall arrange for all sworn testimony to be recorded either by a stenographic reporter or by means of a voice recording device. The judge shall have the record transcribed. The transcript, certified as accurate by the judge or reporter, as appropriate, shall be filed with the court. If the testimony was recorded by means of a voice recording device, the judge shall also file the original recording with the court.

(e) *Contents.* The contents of a warrant upon oral testimony shall be the same as the contents of a warrant upon affidavit.

(f) *Entry of time of execution.* The person who executes the warrant shall enter the exact time of execution on the face of the duplicate original warrant.

**(4) Location of search.** A search warrant may authorize a search to be conducted anywhere in the

and discusses these statutes and the important protections they provide. Tate, majority op., ¶¶45-50.

¶153 Indeed, the Tate majority opinion acknowledges that the circuit court's order for such data "should have" complied with the statutes governing warrants and governing subpoenas for documents in criminal cases, Wis. Stat. §§ 968.12 and 968.135, and that these statutes "express legislative choices about procedures to employ for warrants and criminal subpoenas." Tate, majority op., ¶¶49-51.[99]

---

state and may be executed pursuant to its terms anywhere in the state.

[98] Wisconsin Stat. § 968.135 states as follows:

**Subpoena for documents**

Upon the request of the attorney general or a district attorney and upon a showing of probable cause under s. 968.12, a court shall issue a subpoena requiring the production of documents, as specified in s. 968.13(2). The documents shall be returnable to the court which issued the subpoena. Motions to the court, including, but not limited to, motions to quash or limit the subpoena, shall be addressed to the court which issued the subpoena. Any person who unlawfully refuses to produce the documents may be compelled to do so as provided in ch. 785. This section does not limit or affect any other subpoena authority provided by law.

[99] Indeed, we made clear in State v. Popenhagen, 2008 WI 55, ¶84, 309 Wis. 2d 601, 749 N.W.2d 611, that "the objective of [the criminal subpoena statute, Wis. Stat.] § 968.135[,] is to allow the State to acquire and use documents while also ensuring that the State meets statutory requirements that protect the privacy interests of persons affected by the subpoena."

We further held in Popenhagen that failure to comply with the requirements of Wis. Stat. § 968.135 results in an invalid warrant and that such a violation justified suppression of evidence obtained by the invalid warrant. Popenhagen, 309 Wis. 2d 601, ¶97.

44

¶154 Despite its acknowledgement of the existence of statutes directly applicable to the circumstances in <u>Tate</u>, the <u>Tate</u> majority opinion asserts that failure to comply with these statutes does not invalidate the search warrant. <u>Tate</u>, majority op., ¶42. The majority opinion in <u>Tate</u> turns a blind eye to the failure of the warrant to comply with multiple requirements of Wis. Stat. § 968.135, which clearly governs the fact situation in <u>Tate</u>, instead asserting that "[n]o specific statutory authority is necessary" in the instant case.

¶155 If the statutes "express legislative choices," why does the <u>Tate</u> majority opinion rule that these legislative choices require only compliance with the "spirit" of the statute rather than compliance with the text of the statute? <u>Tate</u>, majority op., ¶¶2, 51.

¶156 The <u>Tate</u> majority opinion assures us that, despite compliance "in spirit" rather than actual compliance with the text, "[the defendant] was not deprived of Wis. Stat. § 968.135's safeguards." <u>Tate</u>, majority op., ¶50.[100]

¶157 Yet the warrant in <u>Tate</u> failed to comply with almost all of the statutory requirements of the subpoena statute. Wisconsin Stat. § 968.135 requires that "[t]he documents shall be returnable to the court which issued the subpoena." The order in the instant case does not mention the return of any of the data recovered to the circuit court.

---

[100] Wisconsin Stat. § 968.135 asserts that it "does not limit or affect any other subpoena authority provided by law," but the majority opinion describes a nonstatutory "warrant," not subpoena authority.

45

¶158 Wisconsin Stat. § 968.135 requires that "[m]otions to the court, including, but not limited to, motions to quash or limit the subpoena, shall be addressed to the court which issued the subpoena." The order in the instant case never provided any opportunity for motions to the court, because it was immediately ordered to "be sealed until otherwise ordered by the court."

¶159 Wisconsin Stat. § 968.135 does not authorize the sealing of subpoenas. The circuit court sealed documents, relying on the statute that authorizes the sealing of orders for pen registers or trap-and-trace devices.[101] The instant case did not involve either a pen register or trap-and-trace device.

¶160 These defects should have rendered the warrant invalid under Wis. Stat. § 968.135.

¶161 To avoid this result, the Tate majority opinion devises a new rule: A statute directly governing a warrant in the particular circumstances of a case need not be followed.

¶162 Tate's new rule ignores the longstanding jurisprudence in this state. When a statute exists governing the warrant at issue, it must be followed unless the legislature expressed its intent otherwise. If the statutory requirements are not met,

_____

[101] See Wis. Stat. § 968.36(5).

the warrant is invalid.[102]  If no statute covers the search in question, law enforcement may seek a warrant if the warrant would have been permissible at common law.  See Meek v. Pierce, 19 Wis. 318 (*300), 322 (*303) (1865).[103]  How will the majority opinion in Tate apply to the new statute directly governing law enforcement access to cell phone location data?

¶163 For the reasons set forth, I conclude that the law enforcement officers in Tate had to comply with Wis. Stat. § 968.135 to obtain a valid warrant to access the defendant's cell phone location data.  They did not.  Consequently, I conclude that no valid warrant was obtained in Tate.

* * * *

¶164 Unlike the majority opinion in Tate and Justice Prosser's lead opinion in Subdiaz-Osorio, I conclude that government access to cell phone location data in the present cases is a search within the meaning of the Constitutions that requires a warrant, and that the warrant must comply with the

---

[102] See, e.g., State v. Baltes, 183 Wis. 545, 198 N.W. 282 (1924) (determining that when law enforcement failed to secure sworn testimony as required by the warrant statute, Wis. Stat. §§ 4839-40 (1923), the warrant was invalid for failing both the statutory and constitutional requirements); Glodowski v. State, 196 Wis. 265, 220 N.W. 227 (1928) (determining that when a search warrant was issued to search a private residence for liquor without evidence of "unlawful manufacture for sale, unlawful sale, or possession for sale, of liquor" as required by the statute, the warrant was void).

[103] In Meek, no statute gave magistrates the power to authorize warrants against private persons in criminal matters and no statute denied this power to magistrates.  Meek, 19 Wis. at 321 (*302-303).  The Meek court held that the prior common-law rules applied as a matter of statutory interpretation.

47

existing directly applicable statutes. The warrant in <u>Tate</u> did not comply with the existing statutes and is invalid. No warrant was obtained in <u>Subdiaz-Osorio</u>.

¶165 Because the various writings in <u>Tate</u> and <u>Subdiaz-Osorio</u> fail to protect privacy, I write in dissent.

¶166 I am authorized to state that Justice ANN WALSH BRADLEY joins Parts I-IV of this dissent.

APPENDIX

## State of Wisconsin



**2013 Assembly Bill 536**

Date of enactment: **April 23, 2014**
Date of publication\*: **April 24, 2014**

# 2013  WISCONSIN  ACT  375

AN ACT *to amend* 134.43 (3), 968.27 (10) and 995.50 (7); and *to create* 968.373 and 968.375 (4) (c) of the statutes;
**relating to:** prohibition on tracking the location of a cellular telephone by law enforcement without a warrant.

*The people of the state of Wisconsin, represented in senate and assembly, do enact as follows:*

SECTION 1. 134.43 (3) of the statutes is amended to read:

134.43 **(3)** Any person who is the victim of an intrusion of privacy under this section is entitled to relief under s. 995.50 (1) and (4) unless the act is permissible under ss. 968.27 to 968.37 968.373.

SECTION 2. 968.27 (10) of the statutes is amended to read:

968.27 **(10)** "Investigative or law enforcement officer" means any officer of this state or political subdivision thereof, who is empowered by the laws of this state to conduct investigations of or to make arrests for offenses enumerated in ss. 968.28 to 968.37 violations of the laws that he or she is employed to enforce, and any attorney authorized by law to prosecute or participate in the prosecution of those offenses.

SECTION 3. 968.373 of the statutes is created to read:

**968.373 Warrant to track a communications device. (1)** DEFINITION. In this section, "communications device" includes any wireless or mobile device that transmits wire or electronic communications.

**(2)** PROHIBITION. Except as provided in sub. (8), no investigative or law enforcement officer may identify or track the location of a communications device without first obtaining a warrant under sub. (4).

**(3)** APPLICATION FOR WARRANT. Upon the request of a district attorney or the attorney general, an investigative or law enforcement officer may apply to a judge for a warrant to authorize a person to identify or track the location of a communications device. The application shall be under oath or affirmation, may be in writing or oral, and may be based upon personal knowledge or information and belief. In the application, the investigative or law enforcement officer shall do all of the following:

(a) Identify the communications device.

(b) Identify, if known, the owners or possessors of the communications device.

(c) Identify, if known, the person who is the subject of the investigation.

(d) Provide a statement of the criminal offense to which the information likely to be obtained relates.

(e) Provide a statement that sets forth facts and circumstances that provide probable cause to believe the criminal activity has been, is, or will be in progress and that identifying or tracking the communications device will yield information relevant to an ongoing criminal investigation.

**(4)** WARRANT. A judge shall issue a warrant authorizing a person to identify or track the location of a communications device if the judge finds that the application satisfies the requirements under sub. (3). A warrant issued under this subsection may not authorize the action for a period that exceeds 60 days. A judge may extend the

---

\* Section 991.11, WISCONSIN STATUTES: Effective date of acts. "Every act and every portion of an act enacted by the legislature over the governor's partial veto which does not expressly prescribe the time when it takes effect shall take effect on the day after its date of publication."

authorized period upon the request of the attorney general or a district attorney if the request satisfies the requirements under sub. (3). Each extension may not exceed 60 days but there is no limit on the number of extensions a judge may grant.

**(4m)** SECRECY. A warrant under sub. (4) shall be issued with all practicable secrecy and the request, application, or other information upon which the warrant is based may not be filed with the clerk or made public until the warrant has been executed and returned to the court. The judge may issue an order sealing the application, request, or other information upon which the warrant is based. The judge may issue an order prohibiting any person who has been ordered by the judge to provide assistance to the applicant from disclosing the existence of the warrant or of the investigation to any other person unless ordered by a judge.

**(5)** ASSISTANCE. Upon the request of the attorney general, a district attorney, or a law enforcement agency authorized by a warrant issued under sub. (4) to track or identify the location of a communications device, the court shall order a provider of electronic communication service or other person to provide to an investigative or law enforcement officer information, facilities, and technical assistance to identify or track the location of the communications device. A person who is ordered under this subsection to provide assistance shall be compensated for the reasonable expenses incurred.

**(6)** CONFIDENTIALITY OF INFORMATION. (a) Information obtained under this section regarding the location of a communications device is not subject to the right of inspection and copying under s. 19.35 (1).

(b) The attorney general, a law enforcement agency, or a district attorney that obtains under this section information regarding the location of a communications device, or evidence derived from the information, shall destroy any information or evidence derived from it if the trial court reaches final disposition for all charges in connection with the investigation that was the subject of the warrant under sub. (4) and no person was adjudged guilty of a crime in connection with the investigation.

(c) Information regarding the location of a communications device that is obtained under this section may be disclosed to other investigative or law enforcement officers.

**(6m)** RETURN. A warrant issued under sub. (4) shall be returned, including in the form of a summary description of the information received, to the court not later than 5 days after the records or information described in the warrant are received by the attorney general, district attorney, or law enforcement agency, whichever is designated in the warrant.

**(7)** DEFENSE AND IMMUNITY. (a) A person on whom a warrant issued under sub. (4) is served is immune from civil liability for acts or omissions in providing records or information, facilities, or assistance in accordance with the terms of the warrant.

(b) A person who discloses the location of a communications device under sub. (8) (b) is immune from civil liability for the acts or omissions in making the disclosure in accordance with sub. (8) (b).

(c) No cause of action may arise against any provider of electronic communication service, or its officers, employees, or agents or other persons specified in the court order under sub. (5), for providing information, facilities, or assistance in accordance with the terms of a court order under sub. (5).

**(7m)** TECHNICAL IRREGULARITIES. Evidence disclosed under a warrant issued under sub. (4) may not be suppressed because of technical irregularities or errors not affecting the substantial rights of the defendant.

**(8)** EXCEPTION. (a) The prohibition in sub. (2) does not apply to an investigative or law enforcement officer who identifies or tracks the location of a communications device if any of the following applies:

1. The customer or subscriber provides consent for the action.

2. An emergency involving danger of death or serious physical injury to any person exists and identifying or tracking the location of the communications device is relevant to preventing the death or injury or to mitigating the injury.

(b) A provider of electronic communication service may disclose the location of a communications device without a warrant if any of the following applies:

1. The customer or subscriber provides consent for the particular disclosure.

2. The provider of electronic communication service believes in good faith that an emergency involving the danger of death or serious physical injury to any person exists and that disclosure of the location is relevant to preventing the death or injury or to mitigating the injury.

**(8m)** JURISDICTION. For purposes of this section, a person is considered to be doing business in this state and is subject to service and execution of process from this state, if the person makes a contract with or engages in a terms of service agreement with any other person, whether or not the other person is a resident of this state, and any part of the performance of the contract or provision of service takes place within this state on any occasion.

**(9)** SEIZURE. Any device used in violation of sub. (2) may be seized as contraband by any law enforcement officer and forfeited to this state in an action under s. 973.075.

SECTION 4. 968.375 (4) (c) of the statutes is created to read:

968.375 **(4)** (c) A record or information that identifies the location of a device used to transmit electronic or wire communications.

**2013 Assembly Bill 536** <span>− 3 −</span> **2013 Wisconsin Act 375**

SECTION 5. 995.50 (7) of the statutes is amended to read:

995.50 (7) No action for invasion of privacy may be maintained under this section if the claim is based on an act which is permissible under ss. 196.63 or 968.27 to ~~968.37~~ 968.373.

SECTION 6. **Initial applicability.**

(1) This act first applies to information regarding the location of a communications device obtained on the effective date of this subsection.